UNITED STATES, Appellee,

v.

Jeffrey R. RICHTER, Technical Sergeant,
U.S. Air Force, Appellant.

No. 98–0109.
Crim.App. No. 32106.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 17, 1998.

Decided Aug. 9, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and EFFRON, J., joined. SULLIVAN, J., filed an opinion concurring in part and dissenting in part. CRAWFORD, J., filed an opinion concurring in the result.

For Appellant: *Captain Tishlyn Taylor* (argued); *Colonel Douglas H. Kohrt* and *Captain W. Craig Mullen* (on brief).

For Appellee: *Major Eric D. Placke* (argued); *Lieutenant Colonel Michael J. Breslin* and *Lieutenant Colonel Anthony P. Dattilo* (on brief); *Major Ronald A. Rodgers* and *Captain Martin J. Hindel.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of dereliction of duty, wrongful disposition of military property (3 specifications), larceny, and wrongful disposition of property to prevent seizure (2 specifications), in violation of Articles 92, 108, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 908, 921, and 934, respectively. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 6 months, and reduction to airman basic. The

Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

This Court granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED BY DENYING THE MOTION TO SUPPRESS EVIDENCE SEIZED FROM APPELLANT'S TRUCK, HOME, GARAGE, AND STORAGE AREAS.

### A

WHETHER THE MILITARY JUDGE ERRED BY CONCLUDING THAT SGT MAXWELL WAS NOT ACTING AS A GOVERNMENT AGENT OR WITH COLOR OF AUTHORITY WHEN [U.S. AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS (OSI)] AGENTS DIRECTED HER TO PLACE A PRETEXT CALL TO APPELLANT FALSELY INFORMING HIM THAT OSI AGENTS SAID THEY HAD A SEARCH WARRANT AND WERE PRESENTLY ON THEIR WAY TO SEARCH HIS HOME.

### B

WHETHER THE MILITARY JUDGE ERRED BY CONCLUDING THAT APPELLANT VOLUNTARILY CONSENTED TO THE SEARCH OF HIS TRUCK CAB, GIVEN THAT AGENTS HAD ALREADY SEIZED EVIDENCE OUT OF THE BACK OF HIS TRUCK, HE WAS UNDER APPREHENSION AND PLACED IN A LOCKED SECURITY POLICE CAR, HE WAS NOT ADVISED OF HIS ARTICLE 31 RIGHTS, AND HE REASONABLY BELIEVED OSI ALREADY HAD A SEARCH WARRANT SINCE OSI LIED TO HIM THROUGH THEIR AGENT ABOUT THE EXISTENCE OF A WARRANT.

### C

WHETHER THE MILITARY JUDGE ERRED BY CONCLUDING THAT APPELLANT VOLUNTARILY CONSENTED TO THE SEARCH OF HIS HOME, GIVEN THAT AGENTS ALREADY SEIZED EVIDENCE OUT OF THE FRONT AND BACK OF HIS TRUCK, HE WAS UNDER APPREHENSION AND TAKEN TO AN OSI INTERVIEW ROOM, HE WAS NOT ADVISED OF HIS ARTICLE 31 RIGHTS, HE WAS DENIED HIS REQUEST TO CALL HIS HOME, AND HE REASONABLY BELIEVED THE OSI ALREADY HAD A SEARCH WARRANT SINCE OSI INTENTIONALLY LIED TO HIM THROUGH THEIR AGENT ABOUT THE EXISTENCE OF A SEARCH WARRANT.

## II

WHETHER, AFTER THE CONVENING AUTHORITY DENIED A DEFENSE REQUEST FOR IMMUNITY FOR AN EXCULPATORY WITNESS BUT GRANTED A PROSECUTION REQUEST FOR IMMUNITY FOR FIVE INCULPATORY WITNESSES, THE MILITARY JUDGE ERRED BY FAILING TO EITHER DIRECT THE CONVENING AUTHORITY TO GRANT THE REQUESTED IMMUNITY OR ABATE THE PROCEEDINGS.

## III

WHETHER THIS COURT SHOULD ORDER A *DUBAY* HEARING TO EXAMINE THE ALLEGATION THAT MAJOR PETERSON, THE PREFERRAL COMMANDER, WAS IMPROPERLY PRESSURED BY THE LEGAL OFFICE TO PREFER CHARGES.

*Factual Background—Issue
I (Motion to Suppress)*

Appellant was the noncommissioned officer-in-charge (NCOIC) of the Combat Supply Station at Nellis Air Force Base, Nevada, working at Indian Springs Air Base. Appellant is a 34–year–old security policeman with 16 years of service. His experience as a security policeman has been in area security, not law enforcement.

Special Agent (SA) Karl Langman, a member of the OSI at Nellis Air Force Base, testified that a member of the Ground Combat Training Flight (GCTF), Sergeant (Sgt) Joseph Marshall, informed him that a number of individuals were stealing and diverting government property for personal use. Sgt Marshall identified appellant as one of the individuals involved. In a statement dated March 30, 1995, Sgt Marshall related that appellant had been seen loading some tents into another NCO's vehicle. In a statement dated April 3, 1995, Sgt Marshall said that appellant took a government-owned mountain bike that was being turned in as excess government property. Sgt Marshall did not say specifically when he observed appellant's conduct, but SA Langman was under the impression it was in early 1995. SA Ray, the OSI operations superintendent, recalled SA Langman telling him that Sgt Marshall said that appellant's garage "is like a warehouse."

SA Langman also was aware of three audit reports from the Air Force Audit Agency indicating lack of control or accountability for government property in appellant's unit. He remembered that night-viewing devices and radios were reported as missing in the audit reports.

SA Langman testified that, after receiving the information from Sgt Marshall, he also interviewed Sgt Kimberly Maxwell, a member of GCTF. Sgt Maxwell told him that appellant gave her a medical cabinet. She consented to a search of her residence and the cabinet was seized.

After interviewing Sgt Maxwell, SA Langman and SA Ray concluded that appellant probably had government property in his quarters. They asked Sgt Maxwell to make a pretext telephone call to appellant. She was instructed to tell appellant that her house had been searched by the OSI and the medical cabinet seized, and that she had overheard a conversation to the effect that OSI had a warrant and "possibly" was coming to his house next. SA Ray testified that Sgt Maxwell told appellant:

OSI was at my house, they had a search warrant. They took the medical chest that you said I could have. I'm scared. I heard them say that they might be coming to your house next, they have a search warrant.

Appellant's recollection of the telephone call was similar. He testified that Sgt Maxwell told him "[t]hat OSI had a search warrant and they had been to her house, and they picked up the medical shelf that she had, and she overheard that they had a search warrant and they were coming to [his] house."

Before Sgt Maxwell made the call, SA Landman and several other investigators positioned themselves to watch appellant's residence. A second police unit was positioned to stop appellant's vehicle "when and if he departed his house with property." SA Ray explained that the purpose of the telephone call was, "if he did indeed have property as alleged, that it might prompt him to leave the house with the property." SA Joseph Wentela described the purpose of the telephone call similarly:

We were going to have a phone call made and see what his reaction was going to be ... to see if he did in fact try to take equipment that he may not need to have at home back to his work center or somebody else's house, just to try to get rid of some equipment that he shouldn't have.

A few moments after Sgt Maxwell made the call, SA Langman observed "two white individuals" near a storage shed alongside the garage. One individual appeared to be loading items in the bed of a truck. They also observed someone near the garbage can. Because it was getting dark, SA Langman was unable to identify the person loading the truck. They could not see whether the person was removing items from the storage shed and placing them in the garbage can or in the bed of the truck.

SA Langman observed the person who had been loading items into the bed of the truck get into the cab, start the engine, and begin to drive toward the "Craig Road gate." The second police team stopped the truck. They used headlights and flashlights for illumination. As SA Langman approached the truck from the rear, two other investigators point-

ed out "apparent government property" in an open box in the bed of the truck.

Appellant, who was driving, asked why he had been stopped, and SA Langman told him he was "under investigation for larceny of government property." SA Langman testified that appellant then made a "spontaneous statement" that "he was taking [the] government property back to work and there was more at his house." SA Langman testified that he cautioned appellant "that he was under investigation for larceny of government property and not to make any more statements." SA Langman seated appellant in the back of a police vehicle, but did not advise him at this point of his rights under Article 31, UCMJ, 10 USC § 831.

Appellant testified that he was stopped and frisked by Sgt Rogers, a security policeman, after his truck was stopped. He testified that SA Langman told him, "You're being charged with larceny of government property from GCTF." He then heard someone say, "We have night vision," and he saw Sgt Rogers holding up the case for a night vision device. He testified that SA Langman told Sgt Rogers, "Seize it for plain view." He testified that he then said, "Yes, they're in there, I'm on my way to work." He testified that SA Langman asked him, "Then why are you going out this gate?" He responded, "Because the gate by the youth center is normally closed at sundown." When appellant said he was going to work, SA Langman said, "No, we know where you're going, you're going to your friend Nelson's." Master Sergeant (MSgt) Steven Nelson was appellant's supervisor, who was also suspected of theft and diversion of government property.

SA Langman testified that, from his vantage point on the sidewalk, he could see a large box in the bed of the truck. The box contained a night viewing device, some winter-weight "bunny boots," and some camouflage netting. The box was open, so that its contents were visible.

In his testimony on the motion to suppress, appellant admitted having government property in his truck. He admitted putting a battery charger and battery for a radio, a carrying case for a "Maxibeam" light, a global positioning system, and a camping stove in his truck after receiving the telephone call. He testified that he intended to take all the items back to work.

SA Langman asked appellant for his consent to search the vehicle. He testified that he explained to appellant that "it was completely voluntary, that he didn't have to allow us to go into his vehicle." Appellant acknowledged that he understood and he consented.

Appellant testified that he did not try to stop the search of his truck because he believed, based on the telephone call from Sgt Maxwell, that they had a search warrant.

Appellant testified that he did not think he was free to leave when he was placed in the back of the police vehicle. He thought he had been apprehended. After appellant sat in the police vehicle for about 10–15 minutes, SA Langman asked him for consent to search the truck. Appellant testified that he responded, "You already did," and SA Langman explained, "No, we want you to consent to searching the cab." After appellant orally consented, the OSI searched the cab of the truck and seized two radios and a battery charger.

SA Langman then instructed appellant to drive his truck out of the traffic lane of the street and to lock it. Appellant testified that, after his truck was searched, SA Langman told him that they were taking him to the OSI building. He asked to call home to check on his son, but he was not allowed to call home or contact anybody about his son.

Appellant was taken to the OSI office, placed in an interview room, and asked to consent to a search of his residence. SA Ray filled in the written consent form, SA Langman explained it, and appellant signed it.

SA Langman testified that he did not mention a search warrant to appellant at any time, neither indicating that he had a warrant nor telling him that he did not have a warrant. Likewise, SA Ray testified that there was no mention of a warrant. No one told appellant that Sgt Maxwell had made the telephone call at the request of the OSI.

Appellant testified that, when they arrived at the OSI office and SA Langman asked him to consent to a search of his house, appellant responded that his only concern was, "due to the hour, that [his] kids would be in bed." Appellant testified that he asked, "Do we have to do this tonight?" and SA Langman said, "Yes." Appellant testified that he concluded he had no choice, based on the telephone call from Sgt Maxwell. He testified that his concern was that if he did not consent, the OSI would use the search warrant to disturb his children and "just basically thrash the house." He signed the consent form "because they told [him] they would not go in the kids' room." Defense counsel asked him, "Did you feel you had any real alternatives to signing it?" Appellant responded, "Not if I didn't—if I wanted them just to go into the house and go into the kids' room, I suppose I didn't have an alternative, but I did not want them going in and disturbing the kids, so that's why I signed the consent form."

Appellant admitted that no one mentioned a warrant, that he did not ask about a warrant, and that the OSI investigators did not say they would "trash [the] whole house." He admitted that the consent form recites that he was not required to consent. He admitted that he was not threatened, and that the OSI agents were "professional." The written form recites that appellant consented to a search of "Government Housing Unit 67B, Manch Manor, Nellis AFB, NV, 67B Stafford, Las Vegas, NV 89115."

The search team at appellant's house was composed of SA Langman, SA Wentela, Sgt Rogers, and Senior Airman White. SA Langman testified that, when they arrived at appellant's house, he felt he owed appellant's wife "an explanation as to why [they] were there." He told her "that [they] were going to be as expeditious and thorough as [they] could but not interrupt her children if at all possible, [and] that [they] were going to begin in the garage."

SA Langman testified that, as soon as the search team began searching the garage, appellant began identifying government property as it was found. SA Langman decided to "stop at that point and advise him." SA Langman advised appellant of his rights under Article 31 and then continued searching.

While the garage was being searched, Airman First Class (A1C) Beavor, one of the security policemen, called SA Langman's attention to a black case in the garbage can. A1C Beavor testified that he saw what appeared to be a night-vision equipment case when he opened the trash can to dispose of a paper cup. This was the same garbage can that SA Langman had noticed near appellant's truck when the pretext telephone call was made. It was on the curb in front of appellant's house, next to the driveway. The black case contained a Motorola radio. According to SA Langman, appellant said that he brought the radio back from Saudi Arabia. Appellant testified that the OSI asked why he threw the radio into the garbage can, and he responded that he did not have a receipt for it and did not want the OSI to find it.

After searching the garage, the agents searched the shed area next to the garage. They seized three tents identified by appellant as government property. They moved next to the back yard, where they found "two plastic containers with voluminous items of individual equipment issue items, sleeping bag, et cetera."

Appellant testified that, when the search party moved from the garage to the back yard, he did not object. He testified that he thought "that it was all part of the warrant," even though no warrant was ever mentioned or displayed.

The search party returned to the OSI office with appellant, at some time after midnight. SA Langman testified that, after a "reaffirmation of the oral rights, in writing," appellant gave a written, sworn statement. The statement is exculpatory and was not offered in evidence. The statement does not mention any belief by appellant that the OSI had a warrant.

The military judge made extensive findings of fact and conclusions of law. He found that appellant "is a mature, experienced, 16–year tech sergeant, 34 years of age, with a security police AFC background for training." He found as fact that Sgt Marshall and Sgt

Maxwell had provided the information described by SA Langman, and that the OSI had audit reports of missing items and supplies from appellant's unit.

The military judge found that Sgt Maxwell's pretext telephone call was made to tell appellant "that the OSI had come to her house, searched her house with a warrant, and were coming to his house with a warrant, or words to that effect." He found that "the intent of the call being made was to observe [appellant's] reactions, if any, after receiving the call." He found that appellant "may have believed that Sgt Maxwell was telling him the truth." Contrary to the implication in Issue I–A, the military judge made no specific findings of fact or conclusions of law on the question whether Sgt Maxwell was acting "as a government agent or with color of authority."

The military judge found that SA Langman observed appellant, "in a quick fashion, exit and enter his quarters a minimum of two or three times," place a "square item" in the bed of his truck, and drive away. He found that appellant was stopped, frisked, and advised that he was being investigated for theft of government property. He found that appellant was not handcuffed or advised of his rights, but "was asked to be seated in the rear of the security police car."

The military judge found that one of the security policemen observed a night-vision goggles case in the bed of the truck and that SA Langman directed that the item be seized. He also found that several security policemen and OSI agents observed several items of suspected government property in the open bed of the truck.

The military judge found that appellant could not exit the police car, as appellant had testified, but that he was not otherwise physically restrained. He found that appellant was never advised that he was being arrested or apprehended.

The military judge found that appellant consented to a search of the truck, that he did not ask about the consequences of refusing to consent, and that no one mentioned a warrant. He found that, "[d]uring the street stop, the procedures were done professional-ly, were physically nonthreatening, and in a noncoercive—at least physically noncoercive—atmosphere."

The military judge found that appellant consented to a search of his "government housing unit," and that appellant did not ask about the consequences of refusing to consent. He found that appellant "conditioned his consent for doing the search at night only," and "conditioned on avoiding a search of his children's bedroom, but in no other way."

The military judge ruled that appellant voluntarily consented to the search of his truck, but that appellant's consent to search the truck was unnecessary under the automobile exception to the Fourth Amendment. The military judge ruled that the OSI had sufficient evidence to make an investigative *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He ruled that appellant had no expectation of privacy in the open bed of the truck, and that there was probable cause to seize the items in plain view.

The military judge ruled that appellant validly consented to the search of his government quarters, notwithstanding the pretext telephone call telling him that the OSI had a warrant. He also ruled that the scope of appellant's consent included the yard, and that even if appellant's original consent did not extend to the yard, he voluntarily broadened his consent by not objecting when the search of the yard began.

Finally, the military judge ruled that appellant had no reasonable expectation of privacy in the contents of his garbage can. Based on his findings of fact and conclusions of law, the military judge denied the motion to suppress.

*Discussion*

Appellant argues that Sgt Maxwell's pretext telephone call vitiated his consent to the search of both his vehicle and his home. The Government argues that the pretext telephone call did not invalidate appellant's consent to the search of the truck, and that under the "automobile exception" to the

Fourth Amendment, appellant's consent was not required. The Government argues further that appellant voluntarily consented to the search of his home.

■■■ We review the military judge's ruling on the motion to suppress for abuse of discretion. His findings of fact will not be overturned unless they are clearly erroneous or unsupported by the record. We review his conclusions of law *de novo*. We will reverse only "if his decision [was] influenced by an erroneous view of the law." *United States v. Sullivan,* 42 MJ 360, 363 (1995); *see also United States v. Reister,* 44 MJ 409, 413 (1996).

We need not decide whether appellant validly consented to the search of his truck, because the items were seized as a result of a valid investigative stop, observation of items in plain view, and a search that was permissible under the "automobile exception" to the Fourth Amendment requirement for a warrant. Mil.R.Evid. 314(f)(1), Manual for Courts–Martial, United States (1995 ed.),* provides: "A person authorized to apprehend ... may stop another person temporarily when the person making the stop has information or observes unusual conduct that leads him or her reasonably to conclude in light of his or her experience that criminal activity may be afoot." This rule implements the "stop and frisk" authority recognized by the Supreme Court in *Terry v. Ohio, supra.* *See* Drafters' Analysis of Mil.R.Evid. 314(f)(1), Manual, *supra* at A22–27; *see also United States v. Texidor–Perez,* 7 MJ 356, 358–59 (CMA 1979).

■■■ In this case, the OSI agents had received information from Sgt Marshall that appellant had taken a government-owned bicycle for his personal use and had been observed loading tents into a privately-owned vehicle. Sgt Maxwell surrendered a government-owned medical cabinet that she said she received from appellant. Based on the uncontested testimony of the OSI agents, the military judge found that the intent of the pretext telephone call was "to observe [appel-

lant's] reactions, if any, after receiving the call." When appellant was observed loading a large box into his truck and driving toward the gate within minutes after the pretext call was made, the "reasonable suspicion" required for a *Terry* stop was satisfied. Once the OSI agents made a lawful investigative stop, it was not a violation of the Fourth Amendment for them to observe items in plain view. *See United States v. Owens,* 51 MJ 204, 208–09 (1999), citing *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Wisniewski,* 21 MJ 370, 372 (CMA 1986) ("Plain-view observations by an officer properly in a position to have such a view do not constitute unreasonable searches under the Fourth Amendment.").

■■ The military judge found that one security policeman saw night-vision goggles in the bed of the truck, and several security policemen and OSI agents saw other items, *i.e.,* boots and camouflage netting. At that point, they had probable cause to believe that appellant had stolen government property in his truck. Mil.R.Evid. 315(g)(3) implements the "automobile exception" and authorizes a search of an operable vehicle without a warrant if there is probable cause. *See Owens, supra* at 209, and cases cited therein. In light of the foregoing, we hold that the military judge correctly ruled that appellant's truck was lawfully searched and that the search was not tainted by the pretext telephone call.

■■ Unlike the search of appellant's truck, the lawfulness of the search of his home is based solely on his consent. Thus, the impact of the pretext telephone call on his consent must be assessed. The question whether consent to a search was voluntarily given "is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

---

\* All Manual provisions are cited to the version in effect at the time of trial. The 1998 version is unchanged, unless otherwise indicated.

■ In *United States v. Kitts*, 43 MJ 23, 27–28 (1995), this Court set out the legal framework for reviewing a military judge's determination that an accused voluntarily consented to a search. Where the prosecution relies on consent, it has the burden of proving consent by "clear and convincing evidence." *Id.*, citing Mil.R.Evid. 314(e)(5). On appeal, we will review the evidence "in the light most favorable to the Government," and we will not overturn the military judge's finding that an accused voluntarily consented unless it is unsupported by the evidence or clearly erroneous. *Id.*, citing *United States v. Kosek*, 41 MJ 60, 64 (CMA 1994), and *United States v. Middleton*, 10 MJ 123, 133 (CMA 1981).

■ In *United States v. Salazar*, 44 MJ 464, 468 (1996), this Court stated that "[l]aw enforcement officials may properly use sting operations and informants in order to gain valid consent or to induce criminals to bring stolen goods into plain view." However, a search cannot be justified as based on consent where that "consent" was given only after the official conducting the search has asserted that he has a warrant. In such a case, the purported consent is mere acquiescence to authority. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see* Mil.R.Evid. 314(e)(4) ("Mere submission to the color of authority ... is not a voluntary consent."). When the Government uses a third party as a mouthpiece to tell a person that law enforcement authorities have a warrant, it cannot establish consent merely by showing the absence of direct communication between law enforcement authorities and the person giving consent.

■ On the other hand, mere mention of an intent to obtain a warrant or command authorization does not vitiate consent. The question in each case is whether, under the totality of the circumstances, the consent is truly voluntary. *See United States v. McClain*, 31 MJ 130, 133 (CMA 1990) (mention of intent to seek command authorization "must be done in an appropriate manner so as to make the resulting consent truly voluntary"); *see also United States v. White*, 979 F.2d 539, 542 (7th Cir.1992) ("When the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent."); *United States v. Faruolo*, 506 F.2d 490, 494 (2d Cir.1974) (consent voluntarily given even though FBI agent said warrant would be sought and probably would be given).

■ The military judge's finding that appellant voluntarily consented was based on a correct view of the law and is supported by the following evidence. *See Kitts*, 43 MJ at 28.

First, Sgt Maxwell was not a superior, but a subordinate of appellant. Second, appellant thought she was calling as a friend and coactor, not as an OSI agent. Third, the warrant was mentioned to see if appellant would react, not to obtain his consent. Fourth, there were several intervening events between the mention of a warrant and appellant's consent to the search of his residence. Fifth, appellant was advised by OSI of his right to refuse consent. Sixth, appellant voluntarily consented to the search of his truck, even though Sgt Maxwell had not mentioned the truck. Seventh, at no time did any of the OSI agents or security police mention a warrant. Eighth, even though appellant testified that he thought the OSI had a warrant, he used their desire to obtain his consent as a bargaining chip to limit the scope of the search. Finally, the record demonstrates that appellant's attitude throughout the evening was cooperative. He was so actively cooperative during the search of his residence that SA Langman thought it necessary to stop the search and advise appellant of his rights, because appellant was spontaneously pointing out government property. Appellant insisted that he could justify and explain his possession of government property. In contrast, he threw the Motorola radio into the garbage can because it was the one item he did not think he could justify.

On this record, the military judge's finding of voluntary consent was not clearly erroneous. The nine factors set out above, considered together, support the military judge's finding. Accordingly, we hold that the military judge did not abuse his discretion by

denying the motion to suppress the evidence seized from appellant's residence. The Motorola radio seized from appellant's garbage can was admissible on two grounds. If the garbage can was within the scope of appellant's consent to the search of his residence, the radio was admissible as the product of a consensual search. If the garbage can was outside the scope of the search of appellant's residence, the radio was admissible because appellant had no reasonable expectation of privacy in a garbage can placed outside the curtilage for pickup. *California v. Greenwood*, 486 U.S. 35, 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

### Factual Background—Issue II
### (Request for Immunity)

■ The convening authority granted testimonial immunity to five government witnesses, but refused to grant immunity to MSgt Steven Nelson, appellant's immediate superior, who was under investigation, along with appellant, for stealing and diverting government property. The defense asked the military judge to direct the convening authority to grant immunity to MSgt Nelson or abate the proceedings.

MSgt Nelson stated his intention to invoke his right against self-incrimination if called to testify. Appellant made an offer of proof stating that MSgt Nelson would testify that he told appellant that "it was appropriate to give sleeping bags, tents, and other assorted camping equipment to the Boy Scouts for their use at a camp out." He would testify further "[t]hat the Boy Scouts were directed to return the equipment to the residence of [appellant]," and "[t]hat the sleeping bags, tents, and other camping equipment found at [appellant's] residence were the items [MSgt Nelson] permitted the Boy Scouts to use for their camp out and were directed to return to [appellant's] residence."

Appellant testified that the Boy Scout request for the equipment came to him from the scoutmaster, an Air Force captain, and through his wife, a den leader. He discussed the request with MSgt Nelson. No one else was present during the discussion. Appellant testified that MSgt Nelson directed him to let the Boy Scouts use the equipment. The Boy Scouts used the equipment from March 31 until April 2, and then returned it to appellant's residence on April 3. Appellant believed that, because the Boy Scouts were dealing with him and not MSgt Nelson, they believed that he authorized the use of the equipment.

During the hearing on the motion, the military judge noted and defense counsel agreed that, even if the items loaned to the Boy Scouts were deleted, there would still be numerous items alleged to have been stolen that were not loaned to the Boy Scouts.

Counsel for both sides agreed that none of the five witnesses who had been granted testimonial immunity were awaiting court-martial. At least one had been given nonjudicial punishment and several had unfavorable information placed in their personnel files. MSgt Nelson was the only other suspect awaiting trial by court-martial.

The staff judge advocate (SJA) recommended that the convening authority deny the request for testimonial immunity for three reasons. First, the Government was not engaging in discriminatory use of immunity, because MSgt Nelson was already targeted for prosecution. Second, the defense was unable to show that the evidence could not be obtained from another source, because the Boy Scouts could also testify to the same facts. Third, the testimony was not clearly exculpatory.

The convening authority denied the request without reciting any reasons. The convening authority further commented, however, that, "[t]hough not a basis for the denial, it should be noted that a grant of immunity for MSgt Nelson would create substantial difficulty for the legal office in the prosecution of his case." This "difficulty" was based on the fact that both prosecutors in appellant's case were also scheduled to prosecute MSgt Nelson and would have to be removed from a complicated case less than a month before the scheduled trial date.

Responding to the defense motion, the prosecution presented the SJA's recommendation and the charge sheet pertaining to MSgt Nelson. The prosecution argued that

RCM 704(e), Manual, *supra*, was not satisfied because MSgt Nelson was targeted for prosecution.

The military judge denied the defense request to compel a grant of immunity or abate the proceedings. He found that MSgt Nelson would refuse to testify, but found no Government overreaching or discrimination because MSgt Nelson was "clearly a target for prosecution." He found that the evidence was "clearly exculpatory" with respect to some of the items allegedly stolen, but not as to the numerous other items.

## Discussion

RCM 704(e) sets out a three-pronged test for determining when defense-requested immunity must be granted or the proceedings abated:

> (1) The witness intends to invoke the right against self-incrimination to the extent permitted by law if called to testify; and
>
> (2) The Government has engaged in discriminatory use of immunity to obtain a tactical advantage, or the Government, through its own overreaching, has forced the witness to invoke the privilege against self-incrimination; and
>
> (3) The witness' testimony is material, clearly exculpatory, not cumulative, not obtainable from any other source and does more than merely affect the credibility of other witnesses.

Because the three prongs are stated in the conjunctive, all three must be met. *See* Drafters' Analysis of RCM 704(e), Manual, *supra* at A21–38 ("Upon a finding that *all three prerequisites exist*," a military judge may abate the proceedings.) (Emphasis added.) This rule recognizes the view of a majority of the federal courts that there is no right to grants of immunity under the Fifth or Sixth Amendments. *Id.*; *see United States v. Turkish*, 623 F.2d 769, 773–74, 777 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), and cases cited therein. Where, as in this case, the witness is a prosecution target and awaiting trial, the second prong is not met, and "there can be no claim of discrimination or overreaching." *United States v. Shandell*, 800 F.2d 322, 324 (2d Cir.1986); *cf. United States v. Zayas*, 24 MJ 132, 136 (CMA 1987) (military judge must "fashion an appropriate remedy" where prosecution "does not make a particular and substantive contention that testimonial immunity will jeopardize a contemplated future prosecution of the witness"). Accordingly, because the second prong of RCM 704(e) was not satisfied, we hold that the military judge did not abuse his discretion by refusing to abate the proceedings. *See United States v. Monroe*, 42 MJ 398, 402 (1995) (military judge's decision not to abate proceedings reviewed for abuse of discretion).

## Factual Background—Issue III (Alleged Command Influence)

Appellant did not assert unlawful command influence at trial. He raised the issue for the first time before the court below. He submitted post-trial affidavits from himself, MSgt Nelson, and MSgt Nelson's wife, asserting that Major (Maj) Peterson, appellant's commander, was coerced into preferring charges.

In his affidavit, appellant asserts that Maj Peterson told him, after the court-martial but before the convening authority's action, "that the legal office forced him into charging [appellant]." MSgt Nelson asserts that, at some time between June 1 and July 31, 1995, several months before appellant's court-martial, he was informed by his former first sergeant, MSgt Sharon Scott, that Maj Peterson told her that he did not want to prefer charges but that "individuals at the Nellis Legal Office were threatening to remove us from his command if he didn't prefer the charges," and have a different command prefer the charges.

No affidavits from Maj Peterson, MSgt Scott, or any member of the legal office were submitted. The record does not reflect a reason for not submitting them.

## Discussion

Appellant has the initial burden of raising the issue of unlawful command influence. *United States v. Biagase*, 50 MJ 143, 150 (1999), citing *United States v. Stom-*

*baugh*, 40 MJ 208, 213 (CMA 1994). At the appellate level, appellant "must show (1) facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that unlawful command influence was the cause of the unfairness." *United States v. Biagase, supra.* The court below held that the affidavits were insufficient to raise the issue of unlawful command influence.

▮ We hold that, even if the affidavits were sufficient to raise the issue, it was waived. The evidence was readily available from Maj Peterson and MSgt Scott before trial. Appellant does not aver, and the record does not reflect, that any evidence was concealed from him, or that he was unlawfully deterred from raising the issue. Defects in preferring and forwarding charges are waived if not raised at trial, unless the failure to raise the issue is itself the result of unlawful command influence. *United States v. Hamilton*, 41 MJ 32, 37 (CMA 1994).

### Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring in part and dissenting in part):

I concur in the majority opinion, except for the section on command influence. In my view, command influence cannot be waived unless the waiver is clear and knowing. *Mere* failure to raise command influence at the trial level does not constitute a waiver. *See United States v. Hamilton*, 41 MJ 32, 39–41 (CMA 1994) (separate opinions of Judges Wiss and Sullivan). The issue of command influence is such a special threat to justice in the military that the ability to raise it deserves special protections. A knowing and clear waiver must be found on the record to deprive this issue from an appellant who raises it in good faith on appeal.

CRAWFORD, Judge (concurring in the result):

In addition to finding that there was a lawful stop, a plain view search and seizure, and a valid search of the truck under the automobile exception, I would also hold that there was probable cause for an arrest and a search incident to that arrest.

Additionally, I would hold that there was a valid consent to search based on appellant's signing a written consent to search after being advised of his rights. I would excise from consideration of the consent to search the house, the call by appellant's friend who said that the police had a search warrant, since this information was not mentioned by the law enforcement officials at the time they obtained written consent. Furthermore, we should not leave the bench and bar with the impression that absent the nine factors considered by the majority, there would not be voluntary consent. Such an implication is contrary to precedent of this Court, *cf. United States v. Bubonics*, 45 MJ 93, 95 (1996), and the Supreme Court, *cf. Arizona v. Fulminante*, 499 U.S. 279, 286, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Two law enforcement agents, SA Langman and SA Ray, had received information from two non-commissioned officers (NCOs) that one had seen appellant stealing government property and putting it in a truck and the other had received a government medical cabinet from appellant. This was confirmed when the agents seized the cabinet. The second NCO agreed to call appellant and tell him that the police had seized the medical cabinet from her and that "they might be coming to your house next, they have a search warrant."

Probable cause to search exists when there are reasonable grounds to believe that items connected with criminal activity are located in the place to be searched. *United States v. Hester*, 47 MJ 461, 463 (1998). Probable cause to arrest requires reasonable grounds to believe that (1) an offense has been committed and (2) the person to be arrested committed it. RCM 302(c), Manual for Courts–Martial, United States (1995 ed.). Both of these were met here. The information obtained from the NCOs was based on their personal observation. *See United States v. Wood*, 25 MJ 46 (CMA 1987); *United States v. Ochoa*, 12 MJ 281 (CMA 1982). Additionally, the police corroborated this in-

formation by seizing the cabinet from the second NCO. *Hester, supra* at 464. Since both of these NCOs could have been charged with providing false information to the police, there was additional reason to believe them.

Agents placed appellant's house under observation. After the telephone call, appellant was seen loading items into the bed of his truck. When appellant drove away, he was stopped by the agents. During the stop, they noticed government property in the bed of the pickup truck. The issues in this case concern the search of the truck and the subsequent search of appellant's home.

Although the police obtained consent to search the truck, it was not needed because a search incident to arrest would allow a search of the truck bed. In *United States v. Chapman,* 954 F.2d 1352 (7th Cir.1992), a gray Ford Ranger pickup truck was the description of a getaway vehicle used in a bank robbery. Two officers observed the truck and stopped it. They found the two defendants in the back of the truck wearing clothing matching the description of the robbers. As the defendants were escorted out of the truck, the officers observed in plain view the top of a money bag, a holster, and a dark ski mask. Once the defendants were handcuffed, the officers found handguns underneath the carpeting in the front of the truck bed and money in the money bag. The court found that the officers had probable cause to arrest the defendants based on a number of factors: their knowledge that a robbery had just occurred in the area; the description of the getaway vehicle; the initial evasion of the police; and the observation of the two men hiding in the rear of the truck, the money bag, holster, and ski mask. The court also concluded that, once the defendants were arrested, the officers were justified in conducting a warrantless search of the truck bed.

However, the court noted specifically the peculiarity of these facts:

Although the compartment in which Mr. Chapman was hiding might not be a conventional passenger compartment, he can take no solace from the fact that the *Belton* Court noted that its holding did not extend to the trunk of an automobile. [*New York v. Belton,* 453 U.S. 454, 461 n. 4, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).] Under the circumstances of this case, it is abundantly clear that the rear of the truck functioned as a passenger compartment at the time of the arrest.

954 F.2d at 1358 n. 6.

Since *Belton,* there have been several cases exploring what constitutes a trunk. In *United States v. Henning,* 906 F.2d 1392, 1396 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991), the court determined that the back portion of a sport utility vehicle is considered part of the passenger compartment, noting, "Where, as here, the vehicle contains no trunk, the entire inside of the vehicle constitutes the passenger compartment and may be lawfully searched." The Tenth Circuit later noted that the determination that the cargo area of a sport utility vehicle, whether covered or uncovered, is part of the passenger compartment is primarily based on "reachability." *United States v. Olguin–Rivera,* 168 F.3d 1203, 1205 (10th Cir.1999).

Based on these cases, I would hold that the items obtained from the bed of the truck were obtained based on a search incident to arrest.

After being taken to the OSI Office, appellant was warned of his rights, waived them, and consented to a search of his house.

When the police have probable cause to obtain a search warrant and tell an individual that they could seek a search warrant, this does not undermine the consent. *See, e.g., United States v. Faruolo,* 506 F.2d 490, 495 (2nd Cir.1974)(not coercive where belief was "well founded" that warrant would be issued). In this case, it was the NCO who mentioned the search warrant, not the police. *Cf. United States v. Rios,* 48 MJ 261 (1998); *United States v. White,* 48 MJ 251 (1998). Thus, there is no direct compulsion by law enforcement officials. Trickery by the police does not equal compulsion where there is independent probable cause to arrest an individual and search his house. Police trickery is not necessarily wrong. *See generally* Christopher Slobogin, *Deceit, Pretext, and*

*Trickery: Investigative Lies By the Police,* 76 Or. L.Rev. 775 (1997).

Based on appellant's lawful arrest, the search of appellant's truck incident to that arrest, and the signed written consent to search the house when the police had sufficient probable cause to obtain a search warrant, I concur in the result.