# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, R.Q. WARD, D.C. KING**
Appellate Military Judges

### UNITED STATES OF AMERICA

v.

### CHRISTOPHER L. OLCOTT
### SERGEANT (E-5), U.S. MARINE CORPS

### NMCCA 201300228
### GENERAL COURT-MARTIAL

**Sentence Adjudged**: 31 January 2013.
**Military Judge**: LtCol Eugene Robinson, USMC.
**Convening Authority**: Commanding General, 1st Marine Aircraft Wing, Okinawa, Japan.
**Staff Judge Advocate's Recommendation**: Capt J.A. Sautter, USMC.
**For Appellant**: Maj John Stephens, USMC; LT David Dziengowski, JAGC, USN.
**For Appellee**: Maj David Roberts, USMC; LCDR Keith Lofland, JAGC, USN.

### 30 October 2014

-----------------------------------------------------
### OPINION OF THE COURT
-----------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of one specification of an indecent act and one specification of burglary, in violation of Articles 120 and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 929. A panel of officer

and enlisted members then convicted the appellant, contrary to his plea, of one specification of aggravated sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920. The members sentenced the appellant to eight years' confinement, reduction to the grade of E-1, forfeiture of all pay and allowances, and a bad-conduct discharge. The convening authority approved the sentence as adjudged and, except for the bad-conduct discharge, ordered the sentence executed.

On appeal, the appellant raises multiple assignments of error.[1] After carefully considering the record of trial and the submissions of the parties, we are convinced that the findings and the sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

## Background

On 4 March 2012, the appellant was standing watch as the Duty Noncommissioned Officer (DNCO) at Barracks 460 on board Marine Corps Air Station Futenma, Okinawa, Japan. Around 0100, the appellant witnessed the intoxicated victim, Lance Corporal (LCpl) PM, enter the barracks and stumble past him to her room with the aid of her friend, Corporal (Cpl) DR. At first, LCpl

---

[1] (1) That the Commandant of the Marine Corps's (CMC) Heritage Brief and the Marine Corps Sexual Assault Prevention and Response Program (SAPR) training created the appearance of unlawful command influence, and the military judge's remedies were insufficient to provide the appellant with a fair trial;

(2) That the guilty finding for aggravated sexual assault is legally and factually insufficient;

(3) That the military judge erred by improperly admitting evidence of the appellant's prior sexual misconduct;

(4) That the military judge erred by denying the appellant's motion for an expert consultant in the field of forensic toxicology;

(5) That the appellant's burglary plea was improvident;

(6) That the appellant's trial defense counsel were ineffective by failing to call witnesses during sentencing; and

(7) That the appellant's sentence is inappropriately severe.

Assignments of error numbered (3) through (7) are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed these assignments of error and find them without merit. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

2

PM did not want to go to her room, instead insisting that Cpl DR call LCpl PM's boyfriend, Cpl CR. A short while later, Cpl CR came to the barracks to help LCpl PM to her room. However, since LCpl PM earlier lost her keycard, she "wobbled" outside and climbed through the window of her room and unlocked the door. Record at 617. Cpl CR then assisted LCpl PM to bed, helping her disrobe because, in his words at trial, "she was so intoxicated . . . that she really couldn't do it herself." *Id*. at 618. After giving her a bottle of water and instructing her to lock the door behind him, he left her lying on her bed clad in a bra and panties.

In the duty hut a few doors down from LCpl PM's room sat the appellant and his two assistant DNCO's (ADNCO). Several hours after Cpl CR left LCpl PM's barracks room, the appellant left the duty hut to go up to his barracks room for a rest break. Approximately 30 minutes later, he returned to the duty hut minus his camouflage utility uniform and duty belt, instead wearing a green skivvy shirt, athletic shorts and running shoes. He asked one of the ADNCO's for help in trying to change the settings on his iPhone, specifically to "silence the shutter sound." *Id*. at 681. The appellant then left the duty hut.

Rather than returning to his room, the appellant instead entered LCpl PM's unlocked room and approached her bed where she now lay naked and asleep.[2] For approximately 20 minutes, he stood over her taking a series of digital photographs of her naked body with his iPhone. These pictures ranged from images of LCpl PM's entire naked body to close up images of her vagina and anus. Prosecution Exhibits 3-11.

LCpl PM awoke groggy and confused to a dark outline of a person hovering over her bed. At first, she assumed it was her boyfriend, Cpl CR, who put her to bed earlier that evening. Record at 693-94. Moments later she heard a male voice mentioning getting back in time for duty changeover. Confused at first, she then realized the identity of the person as the appellant. A short time later, she began frantically texting and calling Cpl CR. *Id*. at 695-99.

At trial, the appellant admitted to unlawfully entering LCpl PM's barracks room and seeing her either unconscious or asleep. *Id*. at 855; PE 19 at 1-2. He testified that after he

---

[2] The appellant admitted during his testimony that another Marine in the smoke pit outside the barracks told him that LCpl PM was naked in her room. *Id*. at 855-56.

started taking photographs with his iPhone, LCpl PM stirred awake, looked up at him, and then "reached out and [] grabbed [his] penis through [his] shorts . . . [and said] put it in me." Record at 863-64.  He further testified that he then engaged in consensual intercourse with LCpl PM for approximately 30 minutes before leaving her room.

**Legal and Factual Sufficiency**

In his second assignment of error, the appellant asserts that the guilty finding for aggravated sexual assault is both legally and factually insufficient.  Specifically, he argues that LCpl PM consented to intercourse and she is untrustworthy as evidenced by character testimony at trial.  Appellant's Brief of 9 Dec 2013 at 34-35.  We disagree.

We review questions of legal and factual sufficiency *de novo*.  *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."  *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)).  The test for factual sufficiency is whether "after weighing all the evidence in the record of trial, this court is convinced of the accused's guilt beyond a reasonable doubt."  *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006) (citation omitted), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007).

We are not persuaded by the appellant's claim that LCpl PM consented to sexual intercourse when she awoke to him hovering over her bed with his iPhone at the ready.  LCpl PM testified that she was sleeping and awoke to an unknown person on top of her.  During his testimony, the appellant conceded that he knew LCpl PM was intoxicated when she passed by the duty hut,[3] that she was asleep when he entered her room, and that she remained asleep while he took photographs with his iPhone.  Although LCpl PM was apparently able to climb through her barracks window earlier, ample testimony from witnesses, including one of the ADNCO's in the duty hut, described her as highly intoxicated.

At trial the appellant admitted that he entered her room fully intending to take pictures of her naked body.  Forensic

_____

[3] Cpl DR who escorted LCpl PM to her room testified that when they passed by the duty hut the appellant looked over and playfully asked "is she drunk" and laughed.  Record at 642-43.

4

evidence revealed that he stood over her taking various pictures for approximately 21 minutes, during which time he conceded he became sexually aroused.  Record at 898-99; 901.  He also conceded to having had no prior relationship or contact with LCpl PM.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt.  Furthermore, after weighing all the evidence in the record and having made allowances for not having personally viewed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

## Unlawful Command Influence

In his first assignment of error, the appellant argues that apparent unlawful command influence (UCI) flowing from the Commandant of the Marine Corps' (CMC) Heritage Brief[4] and the Marine Corps' Sexual Assault Prevention and Response (SAPR) program training infected his trial.  Furthermore, he contends that the curative measures adopted by the military judge failed to ameliorate any taint of apparent UCI.[5]

Prior to trial, the appellant through counsel moved to dismiss all charges and specifications on grounds that the Heritage Brief and the SAPR program created both actual and apparent UCI in his case.  Appellate Exhibit XVII at 54-62; Record at 137-64.  The defense motion cited concerns of unlawful influence on potential members, and a chilling effect upon potential defense witnesses and the convening authority.  During the motion session, however, the civilian defense counsel principally narrowed the defense focus to unlawful influence on potential court-martial members.  Record at 162-63.[6]

---

[4] For a more full description of the Heritage Brief, see *United States v. Howell*, No. 201200264, 2014 CCA LEXIS 321, unpublished op. (N.M.Ct.Crim.App. 22 May 2014).

[5] Appellant's Brief at 30-32.  We review allegations of UCI not only for actual UCI, but also for the appearance of UCI.  *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (citing *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)).

[6] *See also* AE XVII at 36-43.  At trial, the defense focused on essentially two putative messages flowing from the Heritage Brief: one, that sexual assault allegations are true in the vast majority of cases ("80% statistic") and two, that an overall lack of accountability for misconduct in the Marine Corps can

After reviewing the materials offered, the military judge initially deferred ruling on the defense motion until completion of voir dire "to assess the extent of the impact, if any, of the [CMC's] heritage brief on the potential members for this case." *Id*. at 164. Prior to calling the members, the military judge ruled that the defense met the low threshold of bringing forth some evidence of apparent UCI, and that the Government had met its burden of demonstrating beyond a reasonable doubt that "any such UCI has not affected the proceedings thus far." AE XXVII at 11.

The military judge then ordered a number of remedial measures to remove the taint of any apparent UCI at trial, including supplemental member questionnaires, two additional defense peremptory challenges, an initial panel of at least 16 members, extensive *voir dire*, liberally granting defense challenges, and instructing the panel on CMC White Letter 3-12 along with any additional preliminary or final instructions to the members on the issue of the Heritage Brief. *Id*. at 12.[7]

Despite these measures, the appellant now argues, apparent unlawful influence stemming from the Heritage Brief and the SAPR program, primarily from the topics of credibility of sexual assault victims and accountability of offenders, tainted the appellant's trial. He takes issue with the timing of the military judge's ruling, the military judge's failure to revisit his ruling following *voir dire*, and the military judge's failure to address the impact of the SAPR program in his ruling despite the defense citing it as an independent basis for UCI in their motion. Appellant's Brief at 31. He then posits that a

---

only be remedied by more severe punishment ("kick them out"). AE XVII at 27-32. On appeal, the appellant limits his argument to influence on members at trial. Furthermore, he takes no issue with the military judge's finding of no actual UCI, instead only addressing apparent UCI. Appellant's Brief at 23-32. We agree and similarly find no evidence of actual UCI from the matters raised by the appellant. For purposes of our review, we assume *arguendo* that the appellant sufficiently raised the issue of apparent UCI at trial.

[7] The appellant concedes that the military judge implemented these curative measures at trial with the exception of instructing the panel on White Letter 3-12. Appellant's Brief at 31. The military judge decided not to instruct the members on White Letter 3-12 at the request of civilian defense counsel, who articulated an apparent concern that doing so would only "inject[] the issue of [the CMC's] authority into the deliberation room." Record at 160-63. We find this argument curious, considering that the defense premised its UCI argument in part on the CMC's remarks on the subject of sexual assault in his earlier White Letter 2-12. For more on the content of White Letters 2-12 and 3-12, see *Howell*, 2014 CCA LEXIS 321 at *9-11.

6

"disinterested observer, learning of the military judge's myopic ruling, and considering the problematic responses of the members during individual voir dire, would harbor a significant doubt as to the fairness of [the appellant's] court-martial." *Id*. at 31-32.  We disagree.

The defense shoulders the initial burden of raising the issue of UCI, whether at trial or on appeal.  When raising UCI at the trial level, the defense is required to present "some evidence" of UCI.  That is, the defense must "show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."  *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F. 1999) (citations omitted).  On appeal, the appellant bears the initial burden of showing: (1) facts that, if true, constitute UCI; (2) that the proceedings were unfair; and (3) that the UCI was the cause of the unfairness.  *United States v. Salyer*, 72 M.J. 414, 423 (C.A.A.F. 2013) (citing *United States v. Richter,* 51 M.J. 213, 224 (C.A.A.F. 1999)) (additional citation omitted).  "Thus, the initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation."  *Id*. (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002).

Once the appellant makes this initial showing, whether at trial or on appeal, the burden shifts to the Government.  To meet this burden, the Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute UCI; or (3) that the UCI will not prejudice the proceedings or did not affect the findings and sentence.  *Biagase*, 50 M.J. at 151.  "[O]nce unlawful command influence is raised at the trial level . . . a presumption of prejudice is created."  *United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010) (citing *Biagase*, 50 M.J. at 150).  "To affirm in such a situation, we must be convinced beyond a reasonable doubt that the unlawful command influence had no prejudicial impact on the court-martial."  *Id*. (citing *Biagase*, 50 M.J. at 150-51).

The test for the appearance of UCI is objective.  "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public."  *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006).  An appearance of UCI arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the

7

fairness of the proceeding." *Id*. Consequently, to affirm the findings and sentence in this case, we must be convinced beyond a reasonable doubt on a *de novo* review that any appearance of UCI had no prejudicial impact in this case.[8]

After reviewing the entire record, to include the members' questionnaires and supplemental questionnaires, the *voir dire*, challenges and excusals, and the evidence admitted at trial, we conclude beyond a reasonable doubt that any appearance of unlawful influence was sufficiently ameliorated.

During *voir dire*, the subjects of the Heritage Brief, SAPR training, and related topics of credibility of sexual assault complaints, false reporting, consent and lack of consent due to alcohol intoxication were thoroughly explored with each member. *Voir dire*, challenges, and excusals lasted over a full day in court and span nearly 360 pages of transcript. Members acknowledged that they would keep an open mind and follow the military judge's instructions, despite any contrary message they may have heard during SAPR training or anecdotally on the subject of false reporting and the impact of alcohol on consent. Record at 295, 298, 346-47, 349, 360, 370, 385-86, 399, 416, 519-20, 524, 550, 572-575, 578-80.

Of the total twelve challenges for cause lodged by the defense, the military judge granted eight, and the defense removed three more challenged members through use of its peremptory challenges. Of the twelve defense challenges for cause, civilian defense counsel cited concerns of unlawful influence from the Heritage Brief and/or SAPR training for only three members; LtCol BB, LtCol SK, and MSgt VJ. Record at 446-53.[9] The military judge denied the defense challenges against

---

[8] Citing *Salyer*, 72 M.J. at 423, the appellant argues that we review his claim of apparent UCI *de novo*. Appellant's Brief at 22. The Government agrees that we review claims of UCI *de novo*, but points out that we review a military judge's remedies for an abuse of discretion. Government Brief of 10 Mar 2014 at 13 (citing *Douglas*, 68 M.J. at 354). *Douglas* seemingly requires that we review the military judge's remedies here for an abuse of discretion. 68 M.J. at 354 ("We grant a military judge broad discretion in crafting a remedy to remove the taint of unlawful command influence, and we will not reverse 'so long as the decision remains within that range.'") (quoting *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004)). However, in *Salyer*, a case involving remedial measures adopted by a replacement military judge, the majority reviewed the question of UCI *de novo*, a fact highlighted by the dissent. *See Salyer*, 72 M.J. at 429-31 (Ryan, J., dissenting). Under either standard of review, our decision remains the same.

[9] The remainder of the defense challenges relied on implied bias mostly from the members' reluctance when asked if they could consider a sentence of no

LtCol BB and LtCol SK, on both accounts finding beyond a reasonable doubt that any appearance of UCI stemming from the Heritage Brief and/or any SAPR training had been removed by their answers during *voir dire*. After the military judge granted the challenge against MSgt VJ, *id*. at 447-52, the defense used two of its three peremptory challenges to remove LtCol BB and LtCol SK from the panel, *id*. at 591.

Of the twelve members challenged by the defense, only one, SSgt MA, remained on the panel after the defense exhausted its challenges. Civilian defense counsel argued that SSgt MA displayed an implied bias due to his responses on alcohol intoxication and consent. *Id*. at 589-90. We agree with the military judge's finding that SSgt MA's responses, taken as a whole, revealed openness to considering all facts and circumstances before deciding whether alcohol intoxication deprived one of the ability to consent to sexual activity. *Id*. at 590.

Contrary to the appellant's argument, we find that the curative measures adopted by the military judge sufficiently remedied any appearance of unlawful influence. We conclude beyond a reasonable doubt that a disinterested observer, armed with all the facts and circumstances reflected in the record, would not harbor a significant doubt as to the fairness of the proceedings. *Lewis*, 63 M.J. at 415.

**Conclusion**

The findings and the sentence as approved by the convening

---

punishment or no confinement if sentencing the appellant for all three offenses before the court-martial. *Id*. at 280 (LtCol JM-granted due to personal knowledge of the case); 301-04 (Col HJ-granted due to family member victim of similar crime); 452 (Maj JF—granted due to serving as a uniformed victim advocate); 453-54 (GySgt AR, SSgts JA and GM—all three granted due inelastic attitude on sentence); 540 (GySgt DM-granted due to personal knowledge of the case). The military judge denied a defense challenge for cause against SSgt MS based on actual and implied bias resulting from his responses indicating an inelastic attitude on sentence. However, the defense used its final peremptory challenge to remove him from the panel. *Id*. at 590-91.

9

authority are affirmed.

Senior Judge FISCHER and Judge KING concur.

For the Court


R.H. TROIDL
Clerk of Court