# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, J.A. FISCHER, M.K. JAMISON**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL W. LOIACONO**
**CAPTAIN (O-3), U.S. MARINE CORPS**

**NMCCA 201200451**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 27 April 2012.
**Military Judge:** Col G. W. Riggs, USMC.
**Convening Authority:** Commander, U.S. Marine Corps Forces Command, Norfolk, VA.
**Staff Judge Advocate's Recommendation:** Col D.J. Bligh, USMC.
**For Appellant:** LT David Dziengowski, JAGC, USN.
**For Appellee:** LT Ian MacLean, JAGC, USN.

**25 March 2014**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

JAMISON, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of making a false official statement and engaging in indecent liberty with a child in violation of Articles 107 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 920. The members sentenced the appellant to confinement for six months, forfeiture of all pay and allowances, and a dismissal. The convening authority (CA) approved the sentence as adjudged.

The appellant raises nine assignments of error (AOEs).[1] After consideration of the pleadings of the parties and the record of trial, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.


## Background

The appellant was an activated reservist who re-joined the

---

[1] The appellant raises the following AOEs:

I. When the convening authority (1) stacked the members panel with senior officers from his personal staff, and (2) pre-decided his case would go to a court-martial before completion of the Article 32, UCMJ, hearing, did UCI result? Was appellant's case further infected by UCI when hostile emails and water-cooler talk referring to him as a "homosexual pedophile" pervaded the command and the fiscal chief for MARFORCOM told him that he should plead guilty to save the command money? If the answer is no, did the convening authority become a Type 3 accuser here?

II. Was the appellant deprived his Sixth Amendment right to counsel when his counsel failed to (1) question the members through *voir dire* on their senior-subordinate relationship with the convening authority and his chiefs of staff and (2) investigate exculpatory evidence, plus command emails and water-cooler talk evincing unlawful command influence?

III. Did the military judge deprive the appellant of critical alibi evidence when he erroneously denied the defense motion to compel discovery of T.W.'s Facebook records?

IV. Did the military judge err when he denied the defense motion to sever the charges because it unfairly put the "pervert factor" in play?

V. Did the military judge err when he admitted, over defense objection, the reports of internal phone calls and key-card access at the hotel?

VI. Is the evidence alleging indecent liberties with a child legally and factually insufficient where the Article 32 investigating officer recognized the "fragile" nature of this charge, and that recognition occurred before it became known that T.W. admittedly stole IPODs and deleted Facebook messages to cover it up?

VII. Did the military judge abandon his role as a fair and neutral officer when he violated his own ruling and elicited inadmissible 404(b) evidence from a material witness for the prosecution?

VIII. Is a sentence that includes a dismissal inappropriately severe?

IX. Do the significant accumulation of errors in this case require the setting aside of the findings and sentence?

2

Marine Corps on 15 June 2010.  Occupying a billet that belonged to U.S. Marine Corps Forces Command (MARFORCOM), the appellant was serving as part of the Joint Enabling Capabilities Command (JECC) and assigned to U.S. Africa Command (AFRICOM) at the time of his offenses.

In August of 2011, the appellant was staying in Room 533 at a hotel in Sindelfingen, Germany.  On 18 August 2011, one of the hotel guests, AN, a German national, received anonymous phone calls soliciting sexual acts.  According to AN, the voice on the other line was a male voice that spoke English with an American accent.  When AN registered his complaint, hotel management investigated and determined that the phone calls had come from within the hotel.  At that time, multiple guests had complained about receiving inappropriate and unsolicited anonymous phone calls.  In response, the manager of the hotel directed the implementation of a "trap and trace" tracking device that logged the various room-to-room telephone calls.  This tracking device did not become operational until 23 August 2011.

AN checked out of the hotel on 19 August, but returned on 23 August and checked into Room 521.  At 23:57 on 24 August 2011, AN received another anonymous phone call and recognized the voice as the same person who had called him on 18 August 2011.  After he hung up, AN called AS, a traveling companion who was staying in Room 229.  AN had previously told AS about the anonymous phone calls and both agreed that if the phone calls started again, AS would assist AN in discovering the identity of the caller in an effort to make the calls stop.  At AN's request AS agreed to come up to AN's room.  A few minutes later, AN's hotel phone rang again.  Wanting to ascertain the identity of the caller and to stop the phone calls, AN decided to engage the caller in a conversation.[2]  The subject matter of the phone call essentially dealt with a solicitation for a sexual tryst and culminated in the caller inviting AN to meet in Room 533, the appellant's room.  The caller told AN that he would be in bed with the lights off and would leave his door unlocked so AN could enter.  AN and AS proceeded to Room 533.  AN found the door to Room 533 unlocked; he walked in and turned on the lights in the room.  The person in the bed told AN to turn off the lights and AN recognized the voice as the same voice that had invited him to the room.  AS also entered the room and later identified the appellant as the person lying in the bed.  The appellant then asked "what are you doing in my room."  Both AN and AS left the room.  On the way out the room, AN saw an

---

[2] The phone call lasted 7 minutes.  PE 6.

envelope that had Room Number 533 and the name "Loiacono" written on it. Following this interaction, AN and AS went down to the hotel reception area to call the police.

At approximately 01:00 to 02:00 on the morning of 25 August 2011, TW, a 14-year-old boy, saw a man whom TW later identified as the appellant, enter the hotel's PCS lounge. The PCS lounge was available to all military members and their dependents. The lounge contained a computer, a television, a washer and dryer, and a microwave. The hotel guests who were authorized to access the PCS lounge had a special code programmed on their hotel room key card that gave them 24-hour access to the lounge.

TW had been in the PCS lounge for two to three hours doing laundry, watching movies, and using the PCS lounge's computer to check his e-mail and communicate with his friends on Facebook.

When TW first saw the appellant, he was speaking on his cell phone about having been in his bed asleep and awakened to find another man in his room. Once the appellant finished his call, he exchanged pleasantries with TW, and ascertained from TW that he was 14 years old. The conversation then took an unpleasant turn. First, the appellant commented on the fact that, because TW shared his hotel room with his two brothers, he did not have an unfettered opportunity to masturbate. The appellant asked TW about girls and then the conversation turned to oral sex with men and the appellant asked TW if he had ever been interested in oral sex with men. He also told TW that if the appellant or any of his male friends were aroused, they would have oral sex with one another. During their conversation, the appellant moved closer to TW and sat on a couch about 10 feet from him. Despite TW's attempt to change to subject, the appellant continued to talk to TW in graphic detail about sexual matters and techniques. During his conversation with TW the appellant kept rubbing his crotch area through his shorts. The appellant then said that he needed to make another phone call and TW left the PCS lounge.

On 18 November 2011, the Government preferred one specification of a violation of Article 120, two specifications of a violation of Article 133, and one specification of a violation of Article 134 (alleging indecent language). On 22 November 2011, the special court-martial convening authority (SPCMCA) appointed Lieutenant Colonel (LtCol) RB, a judge advocate, to be the Article 32, UCMJ, Investigating Officer (IO). The IO completed his report on 19 December 2011, recommending a general court-martial and the preferral of one

4

additional charge for a violation of Article 107, UCMJ. Based on the Article 32 investigation, the Government dismissed the original Article 120 specification, preferred a new Article 120 specification, and preferred one specification of a violation of Article 107, UCMJ. The SPCMCA forwarded the case to the CA and on 4 January 2012, the staff judge advocate (SJA) provided his pretrial advice, recommending referral to a general court-martial. Record at 199; Art. 34, UCMJ.

On 4 January 2012, the CA referred the original and additional charges to a standing general court-martial panel. General Court-Martial Convening Order (GCMCO) 1-11 of 30 March 2011. That panel consisted of two colonels, four lieutenant colonels, one major, two captains, and one chief warrant officer 5. On 11 April 2012, the CA signed amended GCMCO 1a-11 for the appellant's trial in Stuttgart, Germany. Amended GCMCO panel 1a-11 consisted of three colonels, six lieutenant colonels, and two majors. Pursuant to a delegation by the CA, the SJA excused one colonel, one lieutenant colonel, and one major. Appellate Exhibits LVI and LVII.

Once the members had been sworn pursuant to RULE FOR COURTS-MARTIAL 807(b)(1)(A), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), the military judge asked the members a series of preliminary questions. Record at 198. The military judge asked the members whether they knew the appellant and whether they knew or had heard anything about the appellant's case. *Id.* at 204. Only three members indicated that they knew something about the case: Colonel (Col) GD, Col AF, and LtCol TC. *Id.* at 204-05. Col GD testified that he was about to assume duties as the Chief of Staff for Marine Corps Forces, Europe (MARFOREUR), and had been doing some preliminary turnover with the current Chief of Staff when the appellant's case had come up during routine turnover conversation. *Id.* Col AF testified that during the August or September timeframe of 2011, he recollected having seen a Serious Incident Report (SIR) regarding the case, but did not remember any details.[3] *Id.* at 205. LtCol TC responded that he had heard of the case in his capacity as the Assistant Chief of Staff G-1 for U.S. Marine Corps Forces, Africa (MARFORAF). LtCol TC had been tasked by the Chief of Staff for MARFORAF to ascertain which command the appellant was

---

[3] Based on his responses during group *voir dire*, the Government requested that he be subject to individual *voir dire*. Record at 235. During individual *voir dire*, Col AF indicated that once he saw the appellant's name on the convening order, he recollected having come across his name in an earlier SIR, but he had no recollection of what the case was about. *Id.* at 243.

attached to because the incident had occurred in Germany. LtCol TC testified that he had spent a considerable amount of time researching what command the appellant was assigned to, and he also recollected having seen a police report regarding the incident. *Id*. at 205-06. During individual *voir dire*, LtCol TC indicated that it was challenging to ascertain the appellant's parent command because he was an individual mobilization augmentee who ultimately was part of MARFORCOM, but was on orders to U.S. Transportation Command.[4] *Id*. at 246-48.

Based on the testimony of the members during group and individual *voir dire*, the Government challenged Col GD and another member, LtCol SY, for cause. *Id.* at 267. The appellant's civilian defense counsel agreed with the Government's challenge of Col GD, but disagreed with the challenge of LtCol SY. *Id*. at 268-69. The military judge granted both challenges. *Id*. at 269. The appellant challenged LtCol TC and another member, Col MR, for cause. *Id.* at 270-71. The military judge granted both challenges. *Id*. at 271-72. The appellant exercised his peremptory challenge against LtCol RR. *Id.* at 272. The members that were empaneled were as follows: Col AF, LtCol LV, LtCol MS, LtCol JD, LtCol DD, and Maj MB.[5] Additional facts necessary for the resolution of particular AOEs are included below.

### I. Unlawful Command Influence and Accuser Issue

For the first time on appeal, the appellant argues that his case was infected with actual and apparent unlawful command influence (UCI) and that certain actions that the appellant attributes to the CA, transformed the CA into a "type three" accuser.[6] In support, he submits two post-trial affidavits, one

---

[4] The JECC is a subordinate command of U.S. Transportation Command.

[5] According to the member questionnaires, at the time of the appellant's court-martial, Col AF was the Assistant Chief of Staff G-4, MARFORCOM. LtCol LV was assigned to MARFORAF as the G-3 Branch Head. LtCol MS was assigned to MARFORCOM as the G-6 Current Operations Branch Head. LtCol JD was assigned to MARFORAF as the G-5 Branch Head. LtCol DD was assigned to MARFOREUR as the G-5 Regional Plans Chief. Major MB was assigned to MARFOREUR as the Comptroller.

[6] The appellant also asserts that his defense counsel team was constitutionally ineffective by not raising UCI at trial. We address that claim in AOE II, *infra*. We note that the appellant's civilian defense counsel mentioned UCI in the appellant's post-trial clemency submission; however, that claim of UCI concerned a series of speeches that the Commandant of the Marine Corps (CMC) gave as part of his Heritage Brief. The appellant's UCI claim on appeal does not address the CMC's Heritage Brief.

from himself and one from LtCol SC, one of the appellant's mentors.[7]  We begin our analysis with the appellant's UCI claim and the standard of review for UCI.

### *Allegation of Actual and Apparent UCI*

The appellant's UCI allegation is three-fold and focuses on both the accusatorial and adjudicative stages of his court-martial.  First, he argues that the CA predetermined that the appellant "would face court-martial regardless of the outcome of the Article 32 Hearing"[8] based on a conversation that the appellant had with the SPCMCA.  Second, the appellant argues that when Mr. C, the MARFORCOM Fiscal Chief, told the appellant that his court-martial "was costing the command too much money and [he] should just accept [his] punishment and save the command the hassle," this constituted actual UCI.  Appendix 1 to Appellant' Brief of 29 Apr 2013, Appellant's Post-Trial Affidavit (Appellant's Affidavit) at 4.  Third, the appellant argues that the CA committed actual UCI by stacking the pool of potential members with officers from the CA's personal staff.

The appellant's apparent UCI allegation recasts the same three issues above with the added contextual allegation that various electronic mail submissions and "water-cooler talk" amongst unspecified staff members of MARFORCOM and the JECC, which suggested that the appellant's guilt had been predetermined, constituted apparent UCI.[9]  Appellant's Affidavit

---

[7] We note that LtCol SC testified on the merits during the defense's case-in-chief.  Record at 509-24.  She also testified on the appellant's behalf in the presentencing phase of the trial.  *Id.* at 626-29.  Additionally, LtCol SC submitted a letter of support as part of the appellant's extensive post-trial clemency petition.

[8] Appellant's Brief of 29 Apr 2013 at 25.

[9] Although the appellant mentions eight e-mails in his post-trial affidavit, he describes only one e-mail with particularity.  This was an e-mail from Col DF (Chief of Staff, MARFORAF) with one of the recipients being Lieutenant Colonel (Lt Col) BY, U.S. Air Force, among others.  The appellant alleges that the e-mail suggested "he was a homosexual pedophile" and that the Marine Corps would hold the appellant accountable.  Although unclear from the appellant's post-trial submission when the alleged e-mail was sent, the justification for why the e-mail was sent to "multiple people" on the JECC, MARFORCOM, and MARFOREUR staffs appears to have had more to do with attempting to ascertain what command would be responsible for holding the appellant accountable based on the allegations.  We base this on LtCol TC's testimony during *voir dire* and LtCol SC's submission that was part of the appellant's clemency petition.  We note that nowhere within the appellant's or LtCol SC's affidavit is there a complaint that this e-mail or other e-

at 1-2; Appendix 2 to Appellant's Brief, Affidavit of LtCol SC at 2.

We disagree and hold that the appellant has failed to meet his burden of production to demonstrate either actual or apparent UCI as he has failed to show "proximate causation between the acts [allegedly] constituting [UCI] and the outcome of the court-martial." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)).

UCI has often been referred to as "the mortal enemy of military justice." *United States v. Gore,* 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas,* 22 M.J. 388, 393 (C.M.A. 1986)). Even the appearance of UCI has the potential to be "'as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Ayers,* 54 M.J. 85, 94-95 (C.A.A.F. 2000) (quoting *United States v. Allen,* 33 M.J. 209, 212 (C.M.A. 1991)). Apparent UCI occurs when "a reasonable member of the public, if aware of all the facts, would have a loss of confidence in the military justice system and believe it to be unfair." *United States v. Allen,* 31 M.J. 572, 590 (N.M.C.M.R. 1990) (citing *United States v. Rosser,* 6 M.J. 267 (C.M.A. 1979)) (additional citation omitted), *aff'd*, 33 M.J. 209 (C.A.A.F. 1991).

For appellate consideration of UCI claims, the appellant bears the burden on appeal to "(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that unlawful command influence was the cause of the unfairness." *Biagase*, 50 M.J. at 150 (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)). When analyzing UCI on appeal, we view the alleged UCI retrospectively in terms of evaluating the actual impact it had on the completed trial. On appeal, prejudice will not be presumed unless the appellant can meet his burden to show "proximate causation between the acts constituting [UCI] and the outcome of the court-martial." *Id*. (citing *Reynolds,* 40 M.J. at 202)).

For purposes of our analysis, we first consider the appellant's UCI claim that occurred during the accusatorial process before moving to his adjudicative UCI claim.

_____

mails impeded or obstructed the appellant's access to evidence or witnesses favorable to his case. In fact, Lt Col BY provided a character statement, Defense Exhibit H, which was admitted during the merits of the appellant's case-in-chief. Record at 494.

*Allegation of Statement by SPCMCA in the Forwarding Process*

The appellant argues that the CA committed actual UCI by having predetermined that the appellant's case was going to be referred to a court-martial, regardless of the outcome of the Article 32 investigation. The appellant claims the SPCMCA told him that his case was going to an Article 32 investigation and that the CA had "decided [the appellant's case] would move forward from the Article 32 hearing." Appellant's Affidavit at 3.

A.  *Waiver of UCI in the Accusatorial Process*

Prior to considering this aspect of the appellant's claim of UCI, we consider whether he waived it by his failure to raise it before the trial court. Our superior court has noted that UCI has been used to cover a "multitude of situations in which superiors have unlawfully controlled the actions of subordinates in the exercise of their duties under the UCMJ." *United States v. Hamilton*, 41 M.J. 32, 36 (C.M.A. 1994) (citation omitted). However, by its clear and unambiguous statutory language, Article 37, UCMJ, applies solely to courts-martial and military tribunals.[10] Indeed, our superior court has long drawn an analytical "distinction between the accusatorial process and the adjudicative stage" of the court-martial proceedings. *United States v. Weasler*, 43 M.J. 15, 17 (C.A.A.F. 1995).

In *United States v. Richter*, 51 M.J. 213 (C.A.A.F. 1999), the Court of Appeals for the Armed Forces (CAAF) held that Technical Sergeant Richter's failure to raise his UCI claim that his commander had been "coerced into preferring charges" was waived. *Richter*, 51 M.J. at 223-24. The CAAF in *Richter* made clear that "[d]efects in preferring and forwarding charges are waived if not raised at trial, unless the failure to raise the issue is itself the result of unlawful command influence." *Id*. at 224 (citing *Hamilton*, 41 M.J. at 37); *see also* R.C.M. 905(b)(1).

---

[10] "No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." Art. 37(a), UCMJ.

In this case, applying the CAAF's analysis in *Hamilton* and *Richter*, we find that by his failure to raise the issue at trial, the appellant waived his claim of UCI associated with the forwarding of charges for trial by general court-martial. The appellant does not allege that the underlying facts were not available to him at the time of his trial. In fact, he alleges that he knew and told his civilian defense counsel. Appellant's Affidavit at 3. Additionally, the appellant does not claim that he was "unlawfully deterred from raising the issue." *Richter*, 51 M.J. at 224.[11] Accordingly, based on the circumstances in this case, we follow *Richter* and conclude that the appellant's claim of UCI in the forwarding process of his court-martial was waived by his failure to raise the issue at trial.

B. *Merits of UCI Claim During the Forwarding Process*

Assuming *arguendo* that the appellant's claim of UCI during the forwarding process was not waived by his failure to raise the issue at trial, he has failed in his burden of production to establish UCI (actual or apparent) and link it to his court-martial. The appellant has not alleged that the SPCMCA was somehow influenced or coerced into making her recommendation to forward the case to the CA. We do not interpret the SPCMCA's comments to the appellant as proof of the CA's interference with her discretion to forward the case. R.C.M. 404(c). Given that the appellant is a commissioned officer, it is hardly remarkable that the CA was tracking the case because by Marine Corps Order the general court-martial convening authority has general cognizance over the disposition of officer misconduct cases within his or her command. *See* Marine Corps Order P5800.16A, Chapter 4 (Ch-1-7, 31 Aug 1999)

Assuming *arguendo* that the CA had expressed an intent to resolve the appellant's case via the court-martial process, we discern no prejudice. First, the allegations against the appellant were of a serious nature. Second, the SPCMCA appointed a judge advocate in the grade of lieutenant colonel to be the Article 32 IO. Third, the Article 32 IO recommended resolution of the appellant's case via general court-martial. Fourth, the SPCMCA forwarded the case to the CA with a recommendation that it be referred to a general court-martial.

---

[11] We note that the CAAF continues to cite to *Richter*, having cited to the case as recently as last year. *See United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013). Admittedly, *Salyer* did not cite to *Richter* for the waiver proposition; however, we note that by citing to *Richter*, the CAAF at least implicitly acknowledges its continued vitality.

Fifth, the SJA recommended disposition of the charges via general court-martial. Based on the appellant's post-trial affidavit, we discern no prejudice or undue influence associated with the forwarding of these charges and no evidence that this forwarding process was in any way proximately connected to any unfairness in the processing of the appellant's court-martial. *Reynolds*, 40 M.J. at 202.

### *Allegation of Statement by Mr. C*

Next, the appellant asserts that the CA committed actual UCI when Mr. C, the MARFORCOM Fiscal Chief, recommended that the appellant "accept [his] punishment and save the command the hassle" because the appellant's court-martial was costing "too much money." Appellant's Affidavit at 4. We disagree.

Assuming that Mr. C is subject to Article 37, UCMJ, the appellant's UCI claim fails for two reasons. First, the appellant has failed in his initial burden of production to show that Mr. C's comment carried with it the "mantle of official command authority." *Stombaugh*, 40 M.J. at 211; *see United States v. Ayala*, 43 M.J. 296, 300 (C.M.A. 1995) (rejecting PFC Ayala's claim of UCI based on post-trial affidavit because affidavit lacked evidence of anyone acting with the "mantle of command authority"). Second, the appellant does not indicate in his post-trial affidavit that Mr. C's comment was made with the intent to coerce or influence the appellant's decision. Assuming *arguendo* that Mr. C's comments -- devoid of any evidence of causal connection or imputation to the CA -- constituted UCI, the appellant would not be entitled to relief because Mr. C's attempt failed: the appellant had his day in court. Moreover, there is no evidence any of the empaneled members knew of Mr. C's comment or how the comment might have been, in any way, causally connected to the appellant's court-martial. As such, we are convinced beyond a reasonable doubt that Mr. C's comment, if made, had no impact upon the findings and sentence of the appellant's general court-martial.

### *Allegation of Court-Stacking*

Next, the appellant alleges that the CA committed actual UCI by assigning senior staff officers from his personal staff to serve on the appellant's court-martial. Alternatively, the appellant argues that by assigning senior staff officers from his staff, this created apparent UCI. Based on his post-trial submission, the thrust of the appellant's claim of UCI centers on that fact that the CA was in the fitness report chain of

11

these staff officers.[12]

A CA may not purposefully "stack" a court-martial to achieve a desired result; officers, otherwise eligible to serve, may not be excluded from service based solely on their grade. *United States v. Hilow,* 32 M.J. 439, 440 (C.M.A. 1991); *United States v. Smith,* 27 M.J. 242 (C.M.A. 1988). Court-stacking does not deprive a court-martial of jurisdiction, but it is a form of UCI. *United States v. Lewis,* 46 M.J. 338, 341 (C.A.A.F. 1997) (citing *Hilow,* 32 M.J. at 440)).

Although a CA may not select court members to achieve a desired result, or exclude eligible members based on grade alone, an accused is not entitled to have a representative cross-section of the community detailed to his court-martial. *United States v. White,* 48 M.J. 251, 254 (C.A.A.F. 1998). Article 25(d), UCMJ, requires a CA to select court-martial members who, "in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." It is permissible for a CA to look first at more senior officers for qualified court members; however, a CA may not systematically exclude lower ranking eligible officers from consideration. *United States v. Crawford,* 35 C.M.R. 3, 12 (C.M.A. 1964).

We begin our analysis with the presumption that the CA acted in good faith and applied the Article 25(d), UCMJ, criteria conscientiously. *United States v. Morrison*, 66 M.J. 508, 510 (N.M.Ct.Crim.App. 2008) (citing *United States v. Carman,* 19 M.J. 932, 936 (A.C.M.R. 1985)); *see also United States v. Masusock,* 1 C.M.R. 32, 36 (C.M.A. 1951) (noting that there is a long-standing legal presumption of "regularity in the conduct of governmental affairs"); *cf. United States v. Hagen*, 25 M.J. 78, 84 (C.M.A. 1987) (holding that within context of allegation of vindictive prosecution by a CA, "[t]here is a

---

[12] For purposes of our analysis, we will assume -- not find -- the accuracy of the appellant's "fitness reporting" assertion. While Col GD (challenged for cause) was clearly in the fitness reporting chain of the CA, we note our initial skepticism with regard to the appellant's claim that the CA was "either the Reporting Senior or Reviewing Officer for the empaneled, senior officer members." Appellant's Brief at 24. First, two of the empaneled lieutenant colonels were members on the staff of MARFORAF, LtCol LV and LtCol JD. The Commanding General, II Marine Expeditionary Force, not the CA, is double-hatted as the Commanding General, MARFORAF. Second, two of the other empaneled members were part of the staff of MARFOREUR, LtCol DD and Major MB. Because MARFOREUR has a Deputy Commanding General in Stuttgart, Germany, and the CA visits MARFOREUR once every "3, 4 months," Record at 240, it is unlikely the CA is the Reviewing Officer for those members.

strong presumption that the convening authority performs his duties as a public official without bias").

The appellant cites no authority for what amounts to an argument that a member of a CA's personal staff is *per se* disqualified from consideration as a court-martial member.[13] Neither this court nor our superior court has ever held that a member who is part of a CA's personal staff is *per se* excluded from selection to sit as a member of a court-martial. Indeed, this type of *per se* exclusion runs counter to the member-selection criteria in Article 25(d), UCMJ. In *United States v. Gooch*, 69 M.J. 353, 360 (C.A.A.F. 2011), the CAAF held that it was legally inappropriate "to exclude all potential members who might have a favorable (or unfavorable) view of an accused" because a "personal relationship" or "personal knowledge of the accused" are not appropriate "Article 25, UCMJ, criteria" for exclusion. *Cf. United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F 2010) (holding that there is no *per se* exclusion "predicated solely on the fact that a senior member of the court-martial is involved in writing or endorsing the effectiveness reports of junior members") (quoting *United States v. Murphy*, 26 M.J. 454, 456 (C.M.A. 1988). There is but one appropriate test for whether a member can sit: impartiality and lack of bias; the principal vehicle to test that premise is *voir dire*. *Gooch*, 69 M.J. at 357 (citing R.C.M. 912(f)(1)(N)). Because the appellant's court-stacking claim -- premised on nothing more than an argument that regardless of factual context a CA commits *per se* UCI (actual or apparent) by selecting members from his personal staff -- has no basis in law, we reject it.

---

[13] The appellant cites *United States v. Greene*, 43 C.M.R. 72 (C.M.A. 1970) to press his UCI claim of improper court-stacking. The facts in *Greene* are clearly distinguishable. First, Airman Basic (AB) Greene litigated his claim before the trial judge. Second, AB Greene produced evidence that suggested there had been a systematic exclusion of junior officers based on a memorandum from the SJA, Fifteenth Air Force. The appellant did not allege any inappropriate court-stacking before entry of his pleas and his *per se* claim lacks merit. There is a general statutory requirement that no accused may be tried by members who are junior in rank or grade. Art. 25(d)(1), UCMJ. Thus, it was clearly appropriate for the CA to select officer members in the grade of major and above. Because the appellant premises his court-stacking argument on a *per se* exclusion of officers from the CA's staff that has no basis in law, and because he has produced no evidence of prejudice, we find that the appellant has not made a "colorable claim" of member bias simply because some of the members selected may have been part of the CA's personal staff. *See United States v. Sonego*, 61 M.J. 1, 4 (C.A.A.F. 2005) (holding that "colorable claim" test is the appropriate test for member bias sufficient to trigger an evidentiary hearing under *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967)).

13

Next, the appellant supplements his apparent UCI claim with allegations of various e-mails and "water cooler" talk on the part of unspecified individuals that allegedly expressed an overall hostile attitude towards the appellant and prejudged his guilt. Appellant's Affidavit at 1; Affidavit of LtCol SC at 2. He argues that this hostility on the part of various staff members, when considered in combination with the above-asserted allegations attributed to the CA, amounts to apparent UCI.

Assuming *arguendo* the accuracy of the appellant's claim, he has not demonstrated that these comments and e-mails had a logical connection to the outcome of his court-martial. *Reynolds*, 40 M.J. at 202; *see Allen*, 33 M.J. at 212(holding that "'[p]roof of [command influence] in the air, so to speak, will not do'") (footnote omitted). The appellant provides no evidence that any officer who sat on his court-martial was exposed to the alleged e-mails or was even aware of any staff member comments. The appellant has not shown how these comments "could reasonably be perceived as carrying the force of command influence." *United States v. Simpson*, 58 M.J. 368, 375 (C.A.A.F. 2003). Nor has the appellant demonstrated that these comments or e-mails dissuaded any witness from testifying.

Additionally, during *voir dire*, the record indicates that no panel member believed that the CA, or the command, expected or desired a certain result from the appellant's court-martial. Record at 219; *see also United States v. Reed,* 65 M.J. 487, 492 (C.A.A.F 2008) (evaluating *voir dire* and member testimony and finding that the Government met its burden of demonstrating no apparent UCI). The mere fact that the appellant's case was the subject of command attention does not, without more, translate into UCI. In this regard, he provides no evidence that any of these comments carried the "mantle of command authority," *Stombaugh*, 40 M.J. at 211, or was attributable to the CA.

Accordingly, we hold that the appellant has failed in his initial burden of providing evidence that any of the acts or comments alleged were the proximate cause of, or even causally connected to, the outcome of his court-martial. *Biagase*, 50 M.J. at 150; *Reynolds*, 40 M.J. at 202; *Reed*, 65 M.J. at 492. We are also satisfied beyond a reasonable doubt that there was no UCI (actual or apparent) at any stage of the court-martial proceedings in this case. Even if the actions the appellant complained of could somehow be characterized as UCI, we are

14

convinced beyond a reasonable doubt that they had no impact upon the findings and sentence of this general court-martial.

*Type Three Accuser Issue*

Next, the appellant claims that his case was briefed "at every MARFORCOM command update" and that the CA had predetermined the dispositions of his case prior to the completion of the Article 32 investigation. Appellant's Affidavit at 3-4. Based on these two claims, the appellant argues that Commander, U.S. Marine Corps Forces Command was disqualified from serving as CA because he was a "type three" accuser in that he had an "other than official interest in the prosecution of the [appellant]." Appellant's Brief at 27. We disagree.

Every accused is entitled to have his or her case handled by an unbiased and impartial CA. *United States v. Nix,* 40 M.J. 6, 7-8 (C.M.A. 1994). "An accuser may not convene a general or special court-martial for the trial of the person accused." R.C.M. 504(c)(1); *see* also R.C.M. 601(c). Article 1(9), UCMJ, defines an "accuser" as: "a person who signs and swears to charges ["type one" accuser], any person who directs that charges nominally be signed and sworn to by another ["type two" accuser], and any other person who has an interest other than an official interest in the prosecution of the accused ["type three" accuser]." *See United States v. Jeter,* 35 M.J. 442, 445 (C.M.A. 1992). The question of whether a CA is an "accuser" under Article 1(9), UCMJ, is a question of law that we review *de novo. United States v. Conn,* 6 M.J. 351, 354 (C.M.A. 1979).

The test for determining whether a CA is a "type three" accuser is whether he is "so closely connected to the offense that a reasonable person would conclude that he has a personal interest in the matter." *United States v. Dinges,* 55 M.J. 308, 312 (C.A.A.F. 2001) (Baker, J., concurring) (quoting *Allen*, 31 M.J. at 585); *United States v. Voorhees,* 50 M.J. 494, 499 (C.A.A.F. 1999); *Nix,* 40 M.J. at 7-8; *see* R.C.M. 601. Disqualifying personal interests include those matters that would directly affect the CA's ego, family, property, and similar personal interests. *Voorhees,* 50 M.J. at 499*.*

Prior to analyzing the appellant's "type three" accuser claim, we first consider whether the appellant waived the issue by his failure to raise the matter at trial. *See United States v. Tittel*, 53 M.J. 313, 314-15 (C.A.A.F 2000) (holding that the

15

appellant waived his accuser claim by his failure to raise it at trial).  Under the circumstances of this case, we hold that the appellant waived his nonjurisdictional "type three" accuser claim.

Even if the appellant did not waive this nonjurisdictional "type three accuser" claim, we find no plain error under these circumstances.  *See United States v. Harcrow*, 66 M.J. 154, 156 n.1 (C.A.A.F. 2008) (defining difference between waiver and forfeiture and acknowledging that the CAAF has frequently used the term "waiver" within the context of plain error review).  The appellant's factual predicate provides no evidence other than speculation that the CA had an other than official interest in his case.  CAs are presumed to act without bias.  *United States v. Brown,* 40 M.J. 625, 629 (N.M.C.M.R. 1994.  The appellant has the burden of rebutting this presumption.  *United States v. Argo,* 46 M.J. 454, 463 (C.A.A.F. 1997) (citing *Hagen*, 25 M.J. at 84).  The appellant asserts nothing in his post-trial submission directly attributable to the CA, other than the CA's interest in the tracking and processing of his court-martial.  Additionally, the appellant does not allege any prejudice and we find none.

We have carefully examined each of the appellant's allegations and evaluated the record of trial.  We conclude that the actions of Commander, U.S. Marine Corps Forces Command were completely consistent with those of any military commander and CA who might be called upon to handle an officer misconduct case.  The appellant's argument appears to conflate command attention with an "other than official interest."  Within the Marine Corps, all general court-martial CAs are required to track and "personally review," at least monthly, all officer misconduct cases under his or her command.  *See* MCO P5800.16A (Change 6), Chapter 4 at 4-2 (stating that all officers exercising GCMCA are required to "generate an internal sense of urgency in [processing] officer misconduct . . . cases. . . . [as] [t]here is no substitute for command attention in officer cases").[14]   A CA is not an accuser when he performs command functions that are reasonably linked to his UCMJ functions.  *Conn*, 6 M.J. at 354.  Because a CA is required to make disposition and referral decisions, absolute neutrality on the part of the CA is not required or even realistic.  R.C.M. 306 and 601(d); *Allen*, 31 M.J. at 584-85.

## II. Ineffective Assistance of Counsel

---

[14] Change 7 to MCO P5800.14A was promulgated 10 February 2014.

In his second AOE, the appellant argues that he received constitutionally ineffective assistance of counsel (IAC). First, the appellant argues that his defense team failed to explore, during voir *dire*, the command relationship between the selected members and the CA. Second, the appellant argues that his defense team was ineffective by not exploring during *voir dire* whether any of the members were aware of various e-mails and "water cooler" talk, some of which allegedly suggested a predetermined measure of guilt on the part of the appellant. Third, the appellant argues that his defense team was ineffective by not investigating the presence and substance of these e-mails in an effort to pursue a UCI claim, a "type three accuser" claim, or to expose the bias of the members. Finally, the appellant argues that his defense team was ineffective in not pursuing a "Full-Scope Lifestyle Polygraph Examination" that the appellant had taken when he became a contracted consultant with the Central Intelligence Agency (CIA). Appellant's Affidavit at 2-3. As part of the background investigation, the appellant also avers that he underwent a psychological evaluation that focused on areas of "sexual misconduct" and "sexual deviance." *Id.* The appellant avers that following his polygraph and psychological profile test, the CIA granted him full clearance in 2009. The appellant argues that his defense team should have pursued this information as exculpatory evidence at his court-martial.

The Government did not submit an opposing affidavit to counter the appellant's post-trial declaration, contending instead that the appellant's declaration and the record do not contain sufficient evidence to overcome the presumption of competence. Appellee's Brief at 34. We agree.

All service members are guaranteed the right to effective assistance of counsel at their court-martial. *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005). We presume that trial defense counsel provided effective assistance throughout the trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004). This presumption is rebutted only by "a showing of specific errors made by defense counsel that were unreasonable under prevailing professional norms." *Davis*, 60 M.J. at 473 (citing *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001)). "[S]econd-guessing, sweeping generalizations, and hindsight will not suffice." *Id.* The evidence of record must establish that counsel "made errors so serious that [they were] not functioning

17

as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687.

Even if a defense counsel commits error, it must be so prejudicial "as to indicate a denial of a fair trial or a trial whose result is unreliable." *Davis,* 60 M.J. at 473 (citing *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001)). Thus, an appellant alleging ineffective assistance of counsel "'must surmount a very high hurdle.'" *United States v. Saintaude*, 61 M.J. 175, 179 (C.A.A.F. 2005) (quoting *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997)). To surmount this high prejudice hurdle, an appellant must demonstrate that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Harrington v. Richter*, 131 S.Ct. 770, 792 (2011) (citing *Strickland*, 466 U.S. at 693).

We will not judge attorney performance by a more exacting standard under the often distorting view provided by hindsight. *Strickland,* 466 U.S. at 687. Additionally, we recognize that the tactical and strategic choices made by defense counsel during trial need not be perfect; instead, they must be judged by a standard ordinarily expected of fallible lawyers. *Gooch,* 69 M.J. at 362.

Ineffective assistance of counsel involves a mixed question of law and fact. *Davis*, 60 M.J. at 473 (citing *Anderson*, 55 M.J. at 201). Whether an appellant received ineffective assistance of counsel and whether the error was prejudicial are determined by a *de novo* review. *Id.* (citations omitted).

### *Failure to Conduct Sufficient Voir Dire*

The appellant's claim of deficient conduct rests on the improper premise that it is a *per se* UCI violation when a CA selects members from his personal staff to sit as court-martial members. *See* Discussion of AOE I, *supra*. Even assuming *arguendo* that the CA was in the fitness reporting chain of *all* the selected members, this is not a *per* se basis to exclude them. R.C.M. 912; *see United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (stating "impartial court-members are a *sine qua non* for a fair court-martial" and an accused does not have a right to a panel of his choice, only a fair one) (quoting *United States v. Modesto*, 43 M.J. 315, 318 (C.A.A.F. 1995)). *Voir dire* is the principal instrument to ensure that members are "free from conflict and bias." *Gooch*, 69 M.J. at 357.

18

Under the circumstances in this case, we find that the *voir dire* process accomplished the goal of empaneling fair and impartial members.  First, the military judge granted the defense team's two challenges for cause.  Record at 269-72.  Second, all the selected members testified in response to the military judge's question that they did not feel the CA expected or desired a certain result from the appellant's case.  *Id*. at 219.  Failure to explore fitness reporting relationships during *voir dire* vis-à-vis the CA was not constitutionally deficient conduct because the mere fact that there may have been a fitness report relationship with the CA is not a basis for disqualification for actual or implied bias and the appellant asserts no legal authority for this position.  Additionally, assuming *arguendo* that the CA was either the reporting senior, or reviewing officer of *all* empaneled members save one,[15] we find no prejudice in the record and the appellant asserts none.

Additionally, we disagree with the appellant's suggestion that his defense team conducted no *voir dire* to explore what information the members had been exposed to regarding the appellant.  Only three of the members that the CA selected had heard of the appellant or his case, Col GD,[16] Col AF, and LtCol TC.  Record at 204-05.  The appellant's civilian defense counsel conducted individual *voir dire* of all three and specifically probed the basis and extent of their knowledge of the appellant's case.  The Government successfully challenged Col GD and the appellant successfully challenged LtCol TC.

The appellant's civilian defense counsel asked Col AF the following:

> CDC:  And just to make sure, I think you've hit on it, but I just want to make it clear, is the only knowledge you have about this case, other than the -- other than what you've read here or heard here today, your only knowledge is that one SIR or that one report?
>
> Col AF:  Yes.

---

[15] Appellant's Brief at 24.

[16] Col GD was the Reporting Senior to LtCol SY.  Record at 218.  Both Col GD and LtCol SY were challenged for cause by the Government and the military judge granted both challenges.  *Id.* at 269.

CDC:  Did you happen to – since has anybody talked to you about it or – and I'm not saying specifically "This is our conversation about Captain Loiacono," did you hear it in passing, or was there a follow-up to that SIR or anything like that?

Col AF:  No, it was so far removed, you know, and – and we're in Norfolk, Headquarters Service Battalion, and it was just one of those of interest.  We get all of them to -- you know, as a mentioned, to include Afghanistan, just -- we were getting copies of all. They come into the Norfolk COM Headquarters, and I was on – at that time I was on the distribution list for all of those things, that's it.

*Id.* at 243-44.

Contrary to the appellant's suggestion, we find that his civilian defense counsel asked questions of Col AF and LtCol TC in an attempt to expose how widespread the "staff talk" was surrounding the appellant and his case.  Based on our review of the record, we conclude that the appellant's defense team was not deficient in conducting its *voir dire* with the goal of empaneling fair and impartial members to sit in judgment of the appellant's case.  Additionally, we find no evidence in the record that the appellant's post-trial allegation of lack of *voir dire* in these areas of inquiry was in any way prejudicial to the appellant's case.[17]  Indeed, based on our review of the record, the military judge's questions, in combination with the questions from the appellant's civilian defense counsel, we find no evidence that would call into question the fairness or impartiality of the empaneled members.

### *Failure to Conduct Additional Investigation*

Next, the appellant argues that his trial defense counsel team was constitutionally deficient in not investigating and presumably securing certain "hostile command e-mails" that allegedly suggested the appellant's guilt.  Assuming, without deciding, that such e-mails existed, the appellant does not allege how these e-mails would have made a difference in his

---

[17] We have also considered and reject the appellant's IAC claim that his defense team should have explored in *voir dire* whether the CA should have been disqualified as a "type three" accuser.  The members had already testified that they did not feel that the CA expected a certain result in this case or that they had any idea what the CA was thinking with regard to a particular result.  Record at 219.

20

case.  With the exception of Col AF, no member who sat on his panel testified that they knew anything about the appellant or his case, let alone any "hostile e-mails" regarding the appellant.  In fact, the only member who sat, Col AF, testified that he had only seen a relatively generic SIR regarding the appellant's case.

Finally, the appellant argues that his trial defense team was deficient in not pursuing the appellant's polygraph examination and psychological profile he underwent prior to becoming a consultant for the CIA.  This claim fails for at least three reasons.  First, assuming that the CIA would have provided a copy of its polygraph examination questions and psychological profile questions, the opinion of the polygraph examiner would not have been admissible under MILITARY RULE OF EVIDENCE 707, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).  Second, even assuming *arguendo* that the polygraph examiner who conducted the examination would have been competent to testify, his testimony would be improper character evidence under MIL. R. EVID. 405.  Third, assuming *arguendo* that lack of "sexual deviance" was a pertinent character trait and admissible, MIL. R. EVID. 404(a)(1), the polygraph examiner would not have been competent to offer this type of evidence since MIL. R. EVID. 405(a) limits such character evidence to proof by opinion or reputation.  *See United States v. Schelkle*, 47 M.J. 110, 112 (C.A.A.F. 1997) (holding that good military character is not an essential element of a defense and good military character or other character evidence is limited to reputation and opinion testimony).  If the evidence in question would not have been admissible, it is not deficient conduct in failing to pursue the evidence.  *See Richter*, 131 S.Ct. at 789 (stating that there is no obligation for an attorney to "pursue an investigation that would be fruitless . . . . ").

Based on the appellant's post-trial submission and our careful analysis of the record, we find that the appellant, even assuming *arguendo* his allegations are true, has failed to meet his burden of establishing a "factual foundation for [his] claim of ineffective representation." *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000).  Because the appellant's post-trial submission alleges facts that would not result in relief, we reject his claim on that basis and deny the appellant's request for a post-trial evidentiary hearing. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

### III. Denial of Discovery of TW's Facebook Records

In his third AOE, the appellant argues that the military judge abused his discretion in denying the defense request for discovery of TW's Facebook records. We disagree.

Article 46, UCMJ, provides that each party to a court-martial shall have "equal opportunity to obtain witnesses and other evidence." Each party is entitled to evidence that is relevant and necessary; however, a party is not entitled to production of evidence that is "destroyed [or] lost." R.C.M. 703(f)(1) and (f)(2). If requested evidence does not exist, relief is warranted only if it is of "such central importance to an issue that it is essential to a fair trial." R.C.M. 703(f)(2).

We review a military judge's denial of a discovery request for evidence under an abuse of discretion standard. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). "We will uphold the findings of fact of a military judge unless they are clearly erroneous or unsupported by the record." *United States v. Rodriquez*, 57 M.J. 765, 770 (N.M.Ct.Crim.App. 2002) (citation omitted), *aff'd*, 60 M.J. 239 (C.A.A.F. 2004).

In this case, the defense submitted a discovery request for TW's Facebook records based on his testimony at the Article 32 investigation that he was talking with friends on Facebook when the appellant entered the PCS lounge. Without conceding that the Facebook records were relevant or necessary, the Government sent a subpoena to Facebook; however, the Facebook Corporation refused to comply with the subpoena. The Government requested that the military judge issue a Warrant of Attachment, which he executed on 3 April 2012. AE XV. Facebook did not comply with the Warrant of Attachment. At no time did the appellant file a motion to compel the discovery of these alleged Facebook records. Record at 148.

We conclude that the military judge did not abuse his discretion because the appellant failed to meet his burden to show that the evidence in question existed. *See Rodriguez*, 60 M.J. at 246 (holding that Yeoman Third Class Rodriguez failed to meet his threshold burden of demonstrating that the requested evidence existed). Additionally, the appellant failed in his burden to demonstrate either the relevance or necessity of the requested evidence. The appellant's argument for relevance and necessity was premised on the possibility that the evidence in question went to alibi. Record at 137. The appellant, however, did not demonstrate how the evidence in question went to alibi. Indeed, when asked by the military judge, the appellant's

22

civilian defense counsel conceded that no evidence of alibi had been raised with regard to the offenses involving TW.  *Id*. at 533.  The mere fact that TW may have been accessing Facebook at the time the appellant entered the PCS lounge is insufficient to establish alibi.  Accordingly, even assuming *arguendo* that the military judge erred, we find no prejudice.[18]

## IV.  Severance

In his fourth AOE, the appellant argues that the military judge abused his discretion in denying the appellant's motion to sever the charge of communicating indecent language to AN from the charge of indecent liberty with a child.  AE V.  We disagree.

"[M]ilitary practice favors the joinder of all known charges, save in a case where such joinder threatens manifest injustice."  *United States v. Silvis,* 31 M.J. 707, 709 (N.M.C.M.R. 1990) (citations omitted), *aff'd,* 33 M.J. 135 (C.M.A. 1991)*; see* R.C.M. 601(e)(2) and 906(b)(10).  On appeal, an appellant has the burden to show that the military judge's denial caused actual prejudice "by preventing the appellant from receiving a fair trial."  *United States v. Giles,* 59 M.J. 374, 378 (C.A.A.F. 2004) (citation omitted).

We review the military judge's decision whether to grant a motion to sever for an abuse of discretion.  *United States v. Southworth*, 50 M.J. 74, 76 (C.A.A.F. 1999) (citing *United States v. Foster*, 40 M.J. 140, 148 (C.M.A. 1994)).  In doing so, we analyze three factors:  (1) whether the evidence of one offense would be admissible proof of the other; (2) whether the military judge has provided a proper limiting instruction; and, (3) whether the findings reflect an impermissible crossover.  *Southworth*, 50 M.J. at 76.

In this case, we find that although the indecent language offense involving AN could not be used to prove the indecent liberty with a child involving TW, there was an important connection between the two:  proof of identity of the appellant.

---

[18] We find the appellant's argument of prejudice unpersuasive.  The appellant speculates that the Facebook evidence "prevented the establishment of an accurate timeline of events."  Appellant's Brief at 38.  Without more, this evidence would not be probative as to alibi, unless the appellant had independent evidence he was somewhere else.  The appellant's argument that the Facebook evidence may have made a difference if the message itself did not contain a contemporaneous comment that some "weird guy [is] in the [PCS] lounge" or words to that effect, *id*. at 39, is pure speculation and insufficient to raise alibi.

During trial the appellant's theory centered largely on the defense of alibi.[19]  TW testified that when the man whom he later identified as the appellant entered the PCS lounge, he was speaking loudly on his cell phone about having been awakened by a man standing in his room.  Record at 296.  Other than this overlap of proof, we find no other instance in which evidence of the indecent language overlapped with proof of the indecent liberty charge.  Because the identity of the appellant was a central issue in this case, we find that as to identity, proof of one charge was admissible to prove the other charge.

With regard to the second *Southworth* factor, the military judge gave an appropriate spillover instruction that clearly instructed the members to keep evidence of each offense separate.  Record at 576-77.  Prior to giving instructions on findings, the military judge invited appellant to object to any of the instructions.  *Id*. at 540.  The appellant had no objection.  His failure to object weighs in favor of the fact that the instruction eliminated any lingering spillover concern.  R.C.M. 920(f).

With regard to the third *Southworth* factor, we find no impermissible cross-over.  First, the evidence on the indecent liberty charge was strong.  Second, the trial counsel in his argument compartmentalized the two charges by sign-posting that he would first discuss the "offenses from the phone call [the appellant] placed to [AN]" and then later discuss the "offenses stemming from [the appellant's] interaction with [TW] in the PCS lounge."  Record at 541.  Third, the members acquitted the appellant of the indecent language offense involving AN.  *See United States v. Kerr*, 51 M.J. 401, 406-07 (C.A.A.F. 1999) (stating that an appellate court reviews the entire record in evaluating a military judge's ruling on spillover).

## V. Admission of PE 5 and PE 6

In his fifth AOE, the appellant asserts that the military judge abused his discretion when he admitted, over defense

---

[19] While discussing instructions of findings, the appellant's civilian defense counsel conceded that no evidence had been raised as to alibi with regard to the offenses involving TW.  Record at 532-33.

objection, computerized printouts of key-card usage for various hotel rooms (PE 5) and room-to-room telephone logs (PE 6) for the relevant dates. Specifically, the appellant argues that PE 5 and PE 6 were not properly authenticated under MIL. R. EVID. 901. He also argues that the military judge admitted PE 5 and PE 6 without a valid exception to the hearsay rule.[20] We disagree.

We review the military judge's ruling on these two evidentiary matters for an abuse of discretion. *United States v. Foerster*, 65 M.J. 120, 125 (C.A.A.F. 2007) (citing *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005)).

Computer generated records are admissible if the record satisfies the "business-record exception to the hearsay rule" under MIL. R. EVID. 803(6). *United States v. Casey*, 45 M.J. 623, 626 (N.M.Ct.Crim.App. 1996). An authenticating witness need only be generally familiar with the process that generated the record to qualify as an appropriate sponsor for evidence offered under MIL. R. EVID. 803(6). *United States v. Garces*, 32 M.J. 345, 347 (C.M.A. 1991); *see United States v. Harris*, 55 M.J. 433, 437 (C.A.A.F. 2001) (holding that bank teller generally familiar with logbook entry process met requirements of MIL. R. EVID. 803(6) even though she did not make the logbook entries on the date in question). Additionally, our superior court has endorsed the view of federal courts in analyzing the analogous federal rule that "the business records exception should be 'construed generously in favor of admissibility.'" *Foerster*, 65 M.J. at 125 (quoting *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996)).

*PE 5: Computer Printout of Key-Entry Log*

The Government called the lead technician for the hotel, who had worked there for 14 months, to sponsor the admission of PE 5, a key-entry log for various rooms in the hotel. Record at 414-15; PE 5. He testified that access to the hotel's computer room was tightly controlled and that he used a hand-held device to download key-entry data from the locks of the three rooms in question. *Id.* at 415-16. He testified that the hand-held

_____

[20] The appellant appears to argue that the Government when offering PE 5 and PE 6 had an obligation to articulate an exception to the hearsay rule. Appellant's Brief at 51 n.13 & 52 n.14. We disagree. *See* MIL. R. EVID. 103(a)(1). Unless the military judge required a theory of admissibility, the Government did not have an independent requirement to articulate an exception to the hearsay rule.

25

terminal was in working order and he generated a print-out of the key-entry logs. *Id*. at 416. Additionally, he testified that PE 5 was a fair and accurate copy of the data printout that he personally printed. *Id*. at 417. The trial counsel offered PE 5 and the trial defense counsel objected citing hearsay.

On appeal, the appellant has recast his argument to make an authenticity challenge to the admission of this evidence citing MIL. R. EVID. 901. Appellant's Brief at 51-52.[21] By failing to raise it at trial, the appellant forfeited any lack of authentication objection in the absence of plain error. MIL. R. EVID. 103(a)(1). S*ee United States v. Reynoso*, 66 M.J. 208, 210 (C.A.A.F. 2008) (emphasizing the specificity requirement of MIL. R. EVID 103(a)(1)). Based on our review of the record, the objection to hearsay was preserved, but the objection as to authenticity was not. *United States v. Lubich*, 72 M.J. 170, 173 n.6 (C.A.A.F. 2013) (explaining that authenticity and hearsay are distinct evidentiary issues).

Testing for plain error, we find none. An objection based on authenticity under MIL. R. EVID. 901 requires "only a prima facie showing that is 'sufficient to support a finding that the matter in question is what its proponent claims'" it to be. *Id*. (quoting MIL. R. EVID. 901(a)). Clearly, the witness' testimony qualified as sufficient to authenticate PE 5. We also find no prejudice to the appellant's substantial rights and he asserts none.

With regard to the appellant's preserved hearsay objection, we find that the military judge did not abuse his discretion. The testimony of the lead technician for the hotel, his familiarity with downloading key-entry logs from various hotel rooms by use of a hand-held device, and his specific recollection that PE 5 was generated near the time of the events in question, met the requirements of the "business records exception" to the hearsay rule. MIL. R. EVID. 803(6).

   *PE 6: Redacted Computer Printout of Room-to-Room Call Log*

Prior to discussing the ruling of the military judge, some background information is appropriate to explain the reason PE 6

---

[21] The appellant also argues that the military judge erred in admitting PE 5 because it was a copy and not the original. This argument is without merit because with regard to data stored on a computer, "any print-out or other output readable by sight, shown to reflect the data accurately, is an 'original.'" Mil. R. Evid. 1001(3); *see* Mil. R. Evid. 1003 (stating that a duplicate copy is admissible to the same extent as an original).

was heavily redacted when offered into evidence by the Government. When AN first complained to hotel management about receiving anonymous and indecent phone calls, he was not the only one who had complained. AE VI. Prior to trial, the Government provided notice to the defense pursuant to MIL. R. EVID 404(b) that it would seek to admit evidence of other hotel guests who had received anonymous and indecent phone calls. The appellant filed a motion to exclude this evidence primarily citing MIL. R. EVID. 403. AE XI. The military judge granted the motion and ruled that the room-to-room telephone logs be redacted to show only telephone logs associated with calls to specified rooms. AE XIX.

At trial, the Government called the hotel manager, to sponsor the admission of PE 6. He testified that after having received the complaint from AN on 18 August 2011, the hotel implemented a tracking system to keep track of the origin, time, and duration of room-to-room phone calls. Record at 398. The tracking system was not operational until 23 August 2011. *Id*. at 406. When AN complained again on 24 August 2011, a computer printout of room-to-room calls was generated. The hotel manager personally reviewed the printout and testified that PE 6 was a fair and accurate copy of the computer printout he had previously reviewed. *Id*. at 399. The military judge overruled the appellant's hearsay objection and admitted PE 6.

Similar to his appellate objection to PE 5, the appellant has recast his argument to make an authenticity challenge to the admission of this evidence citing MIL. R. EVID. 901. Appellant's Brief at 50-51. By failing to make an authenticity objection at trial, the appellant forfeited that evidentiary objection in the absence of plan error. MIL. R. EVID. 103(a)(1); *see Reynoso*, 66 M.J. at 210 (emphasizing the specificity requirement of MIL. R. EVID 103(a)(1)). Based on our review of the record, the objection to hearsay was preserved, the objection as to authenticity was not. *See Lubich*, 72 M.J. at 173 n.6.

Testing for plain error, we again find none. In fact, the appellant concedes that the hotel manager's testimony "may very well satisfy the requirements [for] authentication under" MIL. R. EVID. 901. Appellant's Brief at 51. Clearly, the testimony of the hotel manager qualifies as sufficient to authenticate PE 6. We also find no prejudice to the appellant's substantial rights and he asserts none.

With regard to the appellant's hearsay objection, we find that the military judge did not abuse his discretion,

27

particularly given the general preference for construing the "business records exception" in favor of admissibility. *Foerster*, 65 M.J. at 125. The hotel manager's general familiarity with the telephone tracking system, in combination with his testimony that PE 6 was accessed and printed at or near the time of the events in question, met the minimal requirements of the "business records exception" to the hearsay rule. Mᴉʟ. R. Eᴠɪᴅ. 803(6).

Assuming *arguendo* that the military judge erred, we note that the members acquitted the appellant of the sole offense directly related to PE 6. Accordingly, we find no prejudice and the appellant asserts none.[22]

## VI. Sufficiency of the Evidence

The appellant's sixth AOE alleges that the evidence was legally and factually insufficient to sustain his conviction for engaging in indecent liberty with a child. We disagree.

We review questions of legal sufficiency *de novo*. *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011). We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citation omitted). We also review the factual sufficiency of the members' findings. The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006) (citations omitted), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007). The term "reasonable doubt" does not mean that the evidence must be free of any conflict. *Id*. (citation omitted). The members may "believe one part of a witness's testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979).

In this AOE, the appellant does not identify any deficiency of proof as to a specific element of the offense. Instead, he

---

[22] Additionally, we also note that the appellant conceded in his opening statement the evidence contained in PE 6: "You're basically looking at two phone calls, two phone calls over a 10-minute period. The first call was 8 seconds; the second call was 7 minutes." Record at 286.

28

mounts a broad-based attack on the credibility of TW by arguing evidence that was offered at trial and argued by trial defense counsel to impeach the credibility of TW. Conducting our own factual sufficiency analysis we disagree with the appellant's argument and find that this evidence, considered and rejected by the members, are insufficient to call into question the factual or legal sufficiency of the evidence. Conducting our analysis, we find TW's testimony to be credible. Accordingly, we find the evidence legally and factually sufficient to prove indecent liberty with a child.[23]

### VII. Impartiality of the Military Judge

In his seventh AOE, the appellant argues that the military judge abandoned his impartial role when he asked AN a question and AN's response touched on an evidentiary matter that the military judge had previously ruled inadmissible. Appellant's Brief at 61. We disagree.

All military judges are presumed to be impartial in their conduct of court-martial proceedings. *United States v. Foster*, 64 M.J. 331, 333 (C.A.A.F. 2007). "'[W]hen a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge actions." *United States v. Martinez*, 70 M.J. 154, 157-58 (C.A.A.F. 2011) (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)). Failure to object at trial to the military judge's alleged partiality may support an inference that the military judge remained impartial. *Foster*, 64 M.J. at 333 (citations omitted).

In this case, we conclude that the military judge's question did not reasonably raise the issue of partiality and we hold that, based on the entire record, there is no reasonable risk that the military judge's conduct could be perceived as undermining the "public's confidence in the military justice system." *Martinez*, 70 M.J. at 159.

---

[23] The appellant also argues that the evidence is insufficient based on the testimony of Ms. MC, who the appellant argues established an alibi for him. Appellant's Brief at 55-56. We disagree. Ms. MC's testimony was only offered to establish the appellant's alibi defense as to the charges involving AN. The appellant's civilian defense counsel conceded that no evidence of alibi was raised with regard to the offense of indecent liberty with a child. Record at 533. Accordingly, the military judge only instructed on alibi as to the offenses involving AN. *Id*. at 573-74.

Having previously granted the defense's motion to exclude evidence of the appellant's multiple phone calls to other hotel guests, the military judge ruled that only evidence of phone calls between the appellant and AN was admissible.[24]  It is within this context, subsequent to the direct examination, cross-examination, and re-direct, that the military judge asked AN a series of questions.  First, he asked AN to describe the appellant's uniform based on AN's earlier testimony that he had seen the appellant the following morning eating breakfast.  Record at 435.  With regard to the military judge's exchange with AN that is the basis for this AOE:

> MJ:  You said that you and [AS] had talked about the possibility of this person calling you again before you went back to the Marriott, is that correct?
>
> AN:  No, sir, we – I arrived at the 27th [sic].
>
> MJ:  Okay.
>
> AN:  And there I met [AS], and he was the co-pilot of the next day.  And we talked about the phone calls and – C
>
> CDC:  Your Honor, I'm just going to object for hearsay purposes.  I know, Your Honor is asking the questions, so, respectfully I objected under hearsay.
>
> MJ:  Okay.  I'll actually sustain your objection against me.
>
> MJ:  What made you think you needed a plan, in case you got more phone calls?  Why did you think you would get more phone calls of a harassing nature?
>
> AN:  Because I haven't been the only one.
>
> CDC:  Your Honor, I'm going to ask for a 39(a) [session], Your Honor.

---

[24] Prior to trial, the Government filed a motion pursuant to MIL. R. EVID 404(b) seeking to admit evidence of other hotel guests who had received anonymous and indecent phone calls.  The appellant moved the court to exclude any evidence of harassing phone calls from the appellant's hotel room, room 533, to other hotel guests based primarily on MIL. R. EVID. 403.  AE XI.  The military judge granted the motion and ruled that the room-to-room telephone logs be redacted to show only telephone logs associated with specified rooms.  AE XIX; PE 6.

> MJ: Okay. Gentlemen, I'm going to ask you to step
> into the deliberation room.

*Id*. at 441-42.

Based on our analysis of the colloquy between the military judge and AN, we discern no partiality with regard to that specific question. It was an open-ended question, which, contrary to the appellant's argument, did not violate the military judge's earlier evidentiary ruling. The substance of the question itself does not suggest an answer that would embrace inadmissible evidence. Once AN's answer did touch on evidence previously ruled inadmissible, the military judge directed an immediate Article 39(a) session, excused the members, and took argument from both parties. When he brought the members back into court, the military judge provided a strong curative instruction. *Id*. at 444-45. The trial defense counsel took no issue with the curative instruction. All members indicated that they could follow the instruction. *Id*. at 445. The members are presumed to have followed the military judge's instruction. *United States v. Reyes*, 63 M.J. 265, 267 (C.A.A.F. 2006) (citations omitted).

We also find that no prejudice flowed from AN's answer because the members acquitted the appellant of the indecent language offense related to AN.

## VIII. Sentence Appropriateness

In his eighth AOE, the appellant argues that his sentence to a dismissal for engaging in indecent liberty with a child and false official statement is inappropriately severe. We disagree.

In accordance with Article 66(c), UCMJ, a military appellate court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." This court reviews the appropriateness of the sentence *de novo*. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires "'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the

31

character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)).

After review of the entire record, we find that the sentence is appropriate for this offender and his offenses. *United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005); *Healy*, 26 M.J. at 395-96; *Snelling*, 14 M.J. at 268. In addition to considering the nature and the seriousness of the specific offenses committed by the appellant, we have carefully considered the individual characteristics of the appellant, which includes his performance during the course of career as well as a significant number of individuals (military and civilian) who provided evidence as to the good character of the appellant. Considering the entire record, we conclude that justice is done and that the appellant receives the punishment he deserves by affirming the sentence as approved by the CA. Granting sentence relief at this point would be to engage in dispensing clemency -- a prerogative uniquely reserved for the CA -- and we decline to do so. *Healy*, 26 M.J. at 395-96.

## IX. Cumulative Error

In his final AOE, the appellant argues the applicability of the "cumulative-error" doctrine and that we should set aside the findings and sentence. Appellant's Brief at 66. We disagree. The "cumulative error" doctrine carries with it the implication that there were errors in sufficient number and magnitude that when combined would necessitate the setting aside of the findings or sentence. *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). Under the circumstances in this case, we have either rejected the appellant's AOEs or found them to be non-prejudicial. The accumulation of AOEs found not to be error or found to be independently non-prejudicial, is insufficient to invoke the "cumulative error" doctrine and we decline to do so. *Id*. This AOE is without merit.

## Conclusion

The findings and the sentence as approved by the CA are affirmed.

Senior Judge MITCHELL and Judge FISCHER concur.

For the Court

32

R.H. TROIDL
Clerk of Court